UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

THOMAS J. DIFONZO AND LAUREN ROGERS,

|                                          |                          |
|------------------------------------------|--------------------------|
| Plaintiffs,                              | Civil. Action No. _____ |
| v.                                       | **JURY TRIAL**           |
|                                          | **DEMANDED**             |

COUNTY OF NIAGARA, RICHARD E. UPDEGROVE,
in his official capacity as County of Niagara Manager,
NIAGARA COUNTY SHERIFF'S OFFICE,
MICHAEL J. FILICETTI, in his official capacity as
Niagara County Sheriff, and DR. KORI GAWRYS, a/k/a
DR. KORI ORTT or DR. KORI ORTT-GAWRYS, individually
and in her official capacity as DIRECTOR, NIAGARA
COUNTY SHERIFF'S FORENSIC LABORATORY,

                              Defendants.
_____

### COMPLAINT AND JURY DEMAND

Plaintiffs Thomas J. DiFonzo and Lauren Rogers, by and through their counsel, Christen E. Civiletto, Esq. and Joseph Ruta, Esq., file this Complaint against defendants County of Niagara, Richard Updegrove, in his official capacity as County of Niagara Manager, Niagara County Sheriff's Office, Michael J. Filicetti, in his official capacity as Niagara County Sheriff, and Dr. Kori Gawrys, a/k/a Dr. Kori Ortt or Dr. Kori Ortt-Gawrys, individually and as Director of the Niagara County Sheriff's Forensic Laboratory (collectively, "Defendants"), and respectfully demand a jury trial and allege as follows:

**PRELIMINARY STATEMENT**

1.  This is an action under the United States Constitution and federal and state laws brought by the above-named plaintiffs against County of Niagara, Richard E. Updegrove, Director, County of Niagara, in his official capacity, Niagara County Sheriff's Office, Niagara County Sheriff, Michael J. Filicetti, in his official capacity, and the former Director for the Niagara County Sheriff's Forensic Laboratory, Dr. Kori Ortt-Gawrys, both individually and in her official capacity as Director, Niagara County Sheriff's Forensic Laboratory, alleging: (1) retaliation in violation of the First Amendment for speaking up about serious improprieties that threaten the integrity of the criminal justice system in Niagara County, and the public's health and safety; (2) defamation; (3) intentional infliction of emotional distress; and (4) negligent retention and supervision, all of which resulted in the demotion, harassment, unjustified discipline, endangerment, defamation, and eventual constructive discharge of Plaintiffs.

**PARTIES**

2.  Plaintiff THOMAS DIFONZO is an adult who resides in Niagara County. Plaintiff DiFonzo is a twenty-five year veteran of the Niagara County Sheriff's Office. He was both a deputy and a forensic chemist with the Niagara County Sheriff's Forensic Laboratory. He was employed by Defendants County of Niagara and Niagara County Sheriff's Office.

3.  Plaintiff LAUREN ROGERS is an adult who resides in Niagara County. Plaintiff Rogers is a former civilian firearms expert and forensic chemist in the Niagara County Sheriff's Forensic Laboratory. She was employed by Defendants County of Niagara and Niagara County Sheriff's Office, and worked at the Niagara County Sheriff's Forensic

Laboratory.

## DEFENDANTS

4.  Defendant COUNTY OF NIAGARA is a municipality in New York State, and, at all times relevant to the Complaint, was acting under color of state law or authority. Its principal place of business is located at 175 Hawley Street, Lockport, NY 14094.

5.  RICHARD E. UPDEGROVE is the County Manager for County of Niagara, and, at all times relevant to the Complaint, was acting under color of state law or authority. He is being sued in his official capacity. Defendant Updegrove oversees the operations of County of Niagara. He is responsible for determining the budget, and managing the non-elected staff members who work for various departments within the county or city. He provides advice and direction to higher-level managers and officials, including the Niagara County Sheriff.

6.  Defendant NIAGARA COUNTY SHERIFF'S OFFICE ("NCSO") is the law enforcement arm of County of Niagara, and, at all times relevant to the Complaint, was acting under color of state law or authority. Its principal place of business is located at 5526 Niagara Street Ext, Lockport, NY 14094.

7.  Defendant MICHAEL J. FILICETTI is the duly elected SHERIFF of COUNTY OF NIAGARA, and, at all times relevant to the Complaint, was acting under color of state law or authority. He is sued in his official capacity. His principal place of business is 5526 Niagara Street Ext, Lockport, NY 14094.

8.  Dr. Kori Ortt-Gawrys is an individual residing at 3415 Ashwood Dr, North Tonawanda, NY 14120. She is sued in both her individual and official capacities, and, at all times relevant to the Complaint, was acting under color of state law or authority, and as the

representative of Defendants County of Niagara, Updegrove, NCSO, and Filicetti. At all times relevant hereto, Defendant Ortt-Gawrys was the Lab Director for the Niagara County Sheriff's Forensic Laboratory. She was also the supervisor of Plaintiffs DiFonzo and Rogers.

9.  The Niagara County Sheriff's Forensic Laboratory ("Sheriff's Forensic Laboratory") is at the same location and on the same floor as the Niagara County Sheriff's Office: 5526 Niagara Street Ext, Lockport, NY 14094.

## JURISDICTION AND VENUE

10. Pursuant to 28 U.S.C. § 1331, the Court has subject matter jurisdiction over the claims asserted in this action because the action involves claims based on the First Amendment to the United States Constitution (U.S. Const. Amend. I), and under 42 U.S.C. § 1983 and 28 U.S.C. § 1343 because this action is brought to redress deprivations under color of state law of rights, privileges, and immunities secured by the United States Constitution.

11. The jurisdiction of this Court over the claims arising under 42 U.S.C. § 1983 is founded on 28 U.S.C. § 1343(3). The jurisdiction of the Court over the claims arising under the First Amendment is founded on 28 U.S.C. §§ 1331 and 1343(3).

12. There is an actual controversy between Plaintiffs and Defendants.

13. The relief requested is authorized pursuant to 42 U.S.C. § 1983 (deprivation of rights, privileges, and immunities secured by the Constitution) and State law.

14. Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(e)(1) because all of the parties reside in this District, and the constructive discharge and offending activities

took place in this District.

15. The State has waived qualified immunity from suit insofar as it has made a general written waiver in Court of Claims Act §8, and it has previously consented to federal jurisdiction before this Court in constitutional claims surrounding matters of public health and safety. Moreover, immunity does not apply to individually-named defendants in their official capacities.

16. The municipalities and public individuals named herein are public entities who acted as an employer, supervisor, decisionmaker, or policymaker, and provided the mantle of authority for the deprivation of constitutional rights described herein.

**FACTUAL BACKGROUND**

17. Plaintiff DiFonzo was employed from June 1997 to September 29, 2021, as a deputy sheriff forensic chemist for County of Niagara. He worked in the Niagara County Forensic Lab.

18. Plaintiff DiFonzo had an exemplary employment record throughout his twenty-five years with Defendants NCSO and Niagara County.

19. Until he was unlawfully retaliated against, he received excellent performance reviews throughout all of his years of employment.

20. Over the years, Plaintiff DiFonzo has provided expert testimony and analysis that has resulted in thousands of criminal convictions.

21. He has testified in state and federal courts, and has provided expert analysis or testimony in Niagara, Orleans, Genesee, and Erie Counties.

22. In 2019, when the events described herein began, Plaintiff DiFonzo also held the title of Assistant Laboratory Director for Defendant NCSO's Sheriff's Forensic Laboratory. He

held that position until March 2020, when he was wrongfully and illegally demoted by Defendants.

23. As part of his responsibilities as a forensic drug chemist and Assistant Laboratory Director, Plaintiff DiFonzo was responsible for receiving evidence, analyzing evidence, maintaining and calibrating equipment, storing evidence, destroying evidence after the requisite time had passed, testifying in court cases, and supervising the drug chemistry department. He is proficient in drug chemistry and ignitable liquids analysis, and also supervised those departments at the Sheriff's Forensic Laboratory.

24. In the drug chemistry department, at all times relevant hereto, DiFonzo supervised Plaintiff Rogers, his adult daughter, Brandon, a chemist who left the Forensic Laboratory, and, eventually Ms. K., another chemist.

25. Plaintiff DiFonzo, at all times relevant hereto, generally reviewed most of the cases that involved drug chemistry.

26. As part of his responsibilities as the Assistant Laboratory Director from April 2017 to March 2020, Plaintiff DiFonzo handled overtime requests, approval of timecards, vacation approval, scheduling, and more. He had expanded access to the County of Niagara's Police Officer Scheduling System ("POSS") and the Correction Officer Scheduling System ("COSS"), and was in charge when the director was absent.

27. Plaintiff DiFonzo is also an adjunct professor at a local university, where he teaches forensic chemistry.

28. Plaintiff Rogers worked for County of Niagara as a civilian firearms expert in the Niagara County Forensic Lab. She was hired in May 2017.

29. Plaintiff Rogers was proficient and an expert in two distinct disciplines: (1) firearms

and tool markings, and (2) controlled substances, which as is also known drug chemistry.

30. Until she was unlawfully retaliated against, Plaintiff Rogers had an exemplary record of employment. She received excellent performance reviews, and she was selected for advanced expert training based on her commitment to her career and her hard work.

31. On May 2, 2017, Defendants hired Defendant Ortt-Gawrys as the new director for the Forensic Laboratory.

32. Defendant Ortt-Gawrys worked as the director until September 3, 2021, when she resigned.

33. Plaintiffs reported to Defendant Ortt-Gawrys, although Plaintiff DiFonzo also supervised Plaintiff Rogers.

34. Defendant Ortt-Gawrys reported to Sheriff Deputy Chief Weidel, her direct supervisor.

35. Deputy Chief Weidel reported to the Undersheriff, Michael Dunn, his direct supervisor.

36. Undersheriff Dunn reported to the Sheriff, Defendant Filicetti.

37. Defendant NCSO employs a strict chain of command in terms of reporting for employee and work-related issues.

38. Defendant Ortt-Gawrys is not certified to handle drug or firearms matters. She handled DNA analysis under the auspices of the Erie County Evidence lab, and serology at the Niagara County Evidence lab.

**Drug Chemist Training and Proficiency**

39. A chemist in a New York State evidence laboratory must be trained and approved by a supervisor before performing any type of forensic analysis for the specific discipline for which they are hired.

40. Forensic drug chemistry, serology, ignitable liquids, and DNA analysis are separate disciplines, each involving specialized training and formal approval by a supervisor.

41. The approval process for a forensic drug chemist involves extensive training.

42. The training procedure is outlined in the Forensic Laboratory's procedures, including in its Training Manual for Controlled Substance.

43. The drug chemist's training is conducted in the laboratory, with a senior or supervisory forensic drug chemist.

44. The drug chemist must first learn to write reports, enter and code data, and measure, read and interpret analysis from an instrument.

45. The drug chemist's training must be documented in a binder, referred to as a controlled substances training binder.

46. The training binder contains documentation for every case the chemist has observed or with which the chemist has assisted. It includes the date, case, time, and procedures used and observed.

47. The training binder contains information about the instruments the chemist has studied.

48. The training binder contains information about drug chemistry literature studied by the chemist.

49. The training binder is kept at the laboratory where the chemist performs his or her analysis.

50. The training binder is made available to the ANAB accreditation board, and, during the accreditation process for the Forensic Laboratory, the ANAB board must be able to review any chemist's training binder in the last least five years, especially for the discipline for which the chemist is signed off.

51. A chemist is not be approved to perform forensic drug chemistry analysis until the chemist's training binder has been approved and signed by a supervisor who is also certified in drug chemistry.

52. Typically, the lab director will also sign the front page of the binder.

53. The chemist must also take and pass an oral and written proficiency exam.

54. The approval process is not only required as part of New York State laboratory procedures, but also is essential to ensure the integrity of the entire criminal justice system; it prevents an injustice to those whose results are being analyzed because, if the chemist is not fully trained and competent, an accused person could be wrongly convicted of a crime they did not commit.

55. The approval process also helps ensure that an accused person is not absolved when they have committed a crime.

56. The approval process helps maintain the integrity of the evidence laboratory so that the entire criminal justice process is not called into question, which would disrupt the functioning of both law enforcement and the prosecution of crimes.

### Ms. K's Training & Certification

57. Ms. K is a chemist employed by Defendant NCSO.

58. Ms. K's discipline was initially toxicology only.

59. In July 2019, Ms. K was not certified or approved for drug chemistry.

60. Up to that point, neither Plaintiff DiFonzo nor Plaintiff Rogers had never trained Ms. K in drug chemistry.

61. At the end of July 2019, Defendant Ortt-Gawrys directed Plaintiff DiFonzo to approve Ms. K for drug chemistry analysis and sign off on her controlled substances/drug

chemistry training binder.

62. Plaintiff DiFonzo refused because Ms. K was not fully trained or proficient in drug chemistry. He indicated that it would be unethical to approve her when neither he nor anyone else had trained her and she was not ready.

63. Specifically, Ms. K did not yet know how to write reports, and she did not know anything about unknown samples or powders.

64. Ms. K was not versed in the public health law surrounding drug analysis and standards.

65. Ms. K was not versed in the penal law surrounding drug chemistry and forensics.

66. Ms. K's controlled substances training binder contained only three pages of documented training cases, which is completely inadequate for the approval needed for drug chemistry approval or certification.

67. By contrast, Plaintiff Rogers had more than five hundred pages in her training binder.

68. Ms. K. readily acknowledged that she was not ready for approval as a forensic drug chemist.

69. Plaintiff DiFonzo indicated to Defendant Ortt-Gawrys that he would begin training Ms. K in forensic drug chemistry.

70. Defendant Ortt-Gawrys insisted that, despite the deficiencies in Ms. K's training and in her binder documentation, Plaintiff DiFonzo approve Ms. K anyway.

71. Plaintiff again refused, and indicated that it would be unethical and illegal to approve Ms. K without proper training.

72. Defendant Ortt-Gawrys became agitated with Plaintiff DiFonzo.

73. Defendant Ortt-Gawrys said that, since she was in charge, she would sign off Ms. K.

74. Plaintiff again raised the concern that this action would be unethical and wrong.

75. At the time, Plaintiff DiFonzo was the only supervisor with drug chemistry certification that could approve and sign off on Ms. K's training binder.

76. In early August 2019, while Plaintiff DiFonzo was away from the Sheriff's Forensic Laboratory on vacation, Defendant Ortt-Gawrys instructed Ms. K. to take the proficiency exam, which she reportedly passed, and then, upon information and belief, improperly signed off on Ms. K's three-page controlled substances binder.

77. Defendant Ortt-Gawrys did not have the authority to sign off on Ms. K.'s binder because Defendant Ortt-Gawrys is certified for DNA and serology, and not drug chemistry.

78. Ms. K herself expressed concern about this premature approval because she was concerned about the ANAB accreditation board's review in the future, and the lack of documentation in her training binder.

79. Upon his return to the office, Plaintiff DiFonzo expressed alarm at what had occurred.

80. Plaintiff DiFonzo reiterated to Defendant Ortt-Gawrys his concern that to approve Ms. K before she was ready was unethical, illegal, and could have serious consequences for the prosecution of drug cases in Niagara County.

81. He regarded the improper certification as a threat to public health and safety.

82. Plaintiff DiFonzo noted that there could be repercussions for future criminal cases, and that their integrity as a forensic laboratory was compromised.

83. Defendant Ortt-Gawrys expressed excessive anger at Plaintiff DiFonzo's concern for the integrity of the evidence lab and the effect on the prosecution of drug cases.

84. Defendant Ortt-Gawrys berated Plaintiff DiFonzo in front of the other Sheriff's Forensic Laboratory employees.

85. Ms. K was also concerned about the premature approval. For approximately one year after her improper sign-off, Ms. K refused to analyze anything except marijuana and pills, because she felt she did not have the proper training.

86. During the year after her improper sign-off, Ms. K was asking Plaintiffs a lot of questions about certain methods for different drugs that she should have learned during training, but did not.

87. Ms. K also did not know how to use an FTIR instrument essential to the analysis of the drugs she was analyzing. FTIR confirmation is required for Federal reports for reporting the base or salt form of cocaine, which is a requirement for federal law.

88. Once she was allowed to analyze powders, just as Plaintiff DiFonzo predicted, Ms. K did in fact misidentify a white powder substance positively as methamphetamine, even though the result was negative.

89. Plaintiff DiFonzo caught the mistake during his routine review of department employee reports.

90. If not caught, this mistake could have had catastrophic consequences for an accused. An innocent person could have been convicted and incarcerated.

91. It was precisely this fear that drove Plaintiff DiFonzo to speak up in the first place.

92. Both Plaintiff Rogers and Plaintiff DiFonzo were concerned about public safety and health, and the repercussions on future criminal cases in County of Niagara.

93. Plaintiff Rogers specifically conveyed those concerns to Plaintiff DiFonzo as her supervisor.

94. Plaintiff DiFonzo assured Plaintiff Rogers that he raised the public health and safety threat to both Defendant Ortt-Gawrys, his immediate supervisor, and, several months

later, with Deputy Chief Pat Weidel, Defendant Ortt-Gawrys' immediate supervisor.

**Retaliation Begins**

95. Immediately after Plaintiff DiFonzo expressed his concern to Defendant Ortt-Gawrys about the unethical and wrongful approval of Ms. K as a drug chemist, Defendant Ortt-Gawrys, with the means and authority given to her by Defendants, began a malicious and sustained campaign to harass and target Plaintiff DiFonzo.

96. Additionally, immediately after Plaintiff DiFonzo expressed his concern about the unethical and wrongful approval of Ms. K as a drug chemist, Defendant Ortt-Gawrys, with the means and authority given to her by Defendants, began a malicious and sustained campaign to harass Plaintiff Rogers, simply because she is the daughter of Plaintiff DiFonzo.

97. From early August 2019 forward, Defendant Gawrys, with the knowledge, authority, and means made available to her by County of Niagara and the official Defendants, waged an unrelenting and malicious campaign of harassment directed at Plaintiffs.

98. Defendants took part in this escalating misconduct by enabling and approving Defendant Ortt-Gawrys' outrageous actions and decisions, and by refusing to investigate legitimate and justified concerns about retaliation and the public health and safety threat raised by Plaintiffs.

99. The actions directed towards Plaintiffs by Defendant Ortt-Gawrys, in particular, occurred on a continuous, daily basis, and are too numerous to list in full. Plaintiffs provide examples.

100.   Defendant Ortt-Gawrys regularly sent staff members to spy on Plaintiff DiFonzo in an effort to try to catch him doing something wrong. This directive upset the staff, and

they indicated as much to Plaintiff DiFonzo, their supervisor.

101.    Defendant Ortt-Gawrys sent three to four email messages a day to Plaintiffs with artificial and unreasonable deadlines for work, and often threatened disciplinary measures if the deadline was not met.

102.    Aside from Plaintiffs, no other forensic chemist had these artificial deadlines, even for the same work, nor were they threatened with discipline for missing them.

103.    On numerous occasions, Plaintiffs would exceed a particularly unreasonable deadline by working from home, or working late. Defendant Ortt-Gawrys would refuse to acknowledge the positive effort.

104.    Defendant Ortt-Gawrys would convey information to Plaintiffs by email, but then, later, verbally give them different information, but hold them accountable for not following the first instruction. This also happened with verbal instructions that were contradicted by written ones.

105.    Defendant would loudly criticize Plaintiffs, and then send a departmental email to every Sheriff's Forensic Laboratory employee about the same issue, knowing full well that everyone knew Plaintiffs were the impetus for the email.

106.    Defendant Ortt-Gawrys would agree to an extension on some of these artificial deadlines, but then deny that she agreed to it. She would hold Plaintiffs accountable for these supposedly unexcused delays.

107.    Defendant Gawrys created or looked for opportunities to embarrass or trick Plaintiffs; many of these opportunities were detailed in hundreds of text messages sent to the Sheriff's Forensic Laboratory employees.

108.    She challenged Plaintiffs unnecessarily, and held them to higher standards than

other people in the lab, including Ms. K.

109.   Defendant Ortt-Gawrys assigned tasks to employees at the lab and to Plaintiffs, but gave Plaintiffs extra steps that required hours of work, including written validation studies that she assigned to Plaintiffs, but not the other employees for the same instrument.

110.   Defendant Ortt-Gawrys assigned these deadlines or higher standards to Plaintiffs so that she could manufacture an opportunity to write Plaintiffs up, berate them, or discipline them.

111.   Defendant Ortt-Gawrys sent texts to other Sheriff's Forensic Laboratory employees, including Plaintiff DiFonzo's supervisees, calling Plaintiffs abusive names, instructing people to not give Plaintiffs rides to the building, sending people to observe what they were doing while working in the laboratory, and falsely telling employees, including Ms. K, that Plaintiffs DiFonzo and Rogers were against them or wanted them gone.

112.   Defendant Ortt-Gawrys falsely told the female employees that Plaintiff DiFonzo did not like working with women, that he despised women, and that he opposed their hiring at the Forensic Laboratory.

113.   Defendant Ortt-Gawrys falsely told the female employees that Plaintiff DiFonzo hated them.

114.   These statements were false.

115.   These statements harmed Plaintiff DiFonzo's reputation.

116.   On other occasions, Defendant Ortt-Gawrys falsely told people within the NCSO that Plaintiff DiFonzo said that a female captain was promoted only because she provided sexual favors to the management.

117.   Plaintiff DiFonzo never would say such a thing, nor did he. He did not believe such an outrageous statement to be in any way true.

118.   Defendant Ortt-Gawrys told people these and other lies to harm his reputation.

119.   Defendants began to use Plaintiff DiFonzo as the basis for sarcastic remarks about men who cannot work for a female supervisor.

120.   One interviewee was told by Chief Weidel, in the presence of the Sheriff, Undersheriff, Dr Gawrys, and Ms. K that a male employee in the Forensic Laboratory had a problem working for a female supervisor.

121.   At the time, Plaintiff DiFonzo was the only male employee at the Forensic Laboratory.

122.   This caused distress for some of the female employees in the Forensic Laboratory, and embarrassed Plaintiffs.

123.   Defendants' statements were untrue, false, and maligned Plaintiff DiFonzo's character and reputation, and negatively  impacted the perception of competence in his profession.

124.   Upon information and belief, the Sheriff's Forensic Laboratory employees were afraid to speak up in support of Plaintiffs because they feared retribution from Defendants.

125.   Defendant Ortt-Gawrys' harassment and humiliation of Plaintiffs escalated, and became a daily occurrence.

126.   Defendant Ortt-Gawrys displayed so much animosity towards Plaintiffs that the Sheriff's Forensic Laboratory employees, including Plaintiffs, became extremely stressed and agitated.

127.   The Sheriff's Forensic Laboratory employees knew at that time that Defendant Ortt-Gawrys was maliciously harassing and targeting Plaintiffs, and they knew that the artificial deadlines and unreasonable assignments were for the purpose of causing Plaintiffs distress and to drive them to resign.

128.   The employees' knowledge of Defendant Ortt-Gawrys' motivations is partially known through hundreds of text messages between them and Defendant Ortt-Gawrys regarding Plaintiffs.

129.   Most of these text messages were sent by and between Defendant Ortt-Gawrys and three other employees of the Forensic Laboratory, including Ms. K and Ms. S, another chemist, both of whom were (or, in Ms. S's case, eventually was) Plaintiff DiFonzo's subordinate employees.

130.   Defendant Ortt-Gawrys frequently announced that she was untouchable because her brother, Hon. Robert Ortt, is a state senator. Defendant Ortt-Gawrys used that fact to intimidate Plaintiffs and Sheriff's Forensic Laboratory employees.

131.   Defendant Ortt-Gawrys began to act paranoid when it came to Plaintiffs. On one occasion, after hearing Plaintiff DiFonzo and another chemist, Ms. S, laugh while he trained her, Defendant Ortt-Gawrys separated them and forbade Ms. S. from being trained by Plaintiff DiFonzo.

132.   Defendant Ortt-Gawrys  pulled Ms. K and Ms. S into her office and warned them if they get caught speaking/whispering with Plaintiff DiFonzo they will be written up and/or terminated. Plaintiff DiFonzo would also be terminated. These statements caused stress and harmed Plaintiff DiFonzo's reputation.

133.   Defendant Ortt-Gawrys told Ms. S, Plaintiff DiFonzo's supervisee, that Plaintiff

DiFonzo would "sabotage" her training and work, thereby impugning him in his professional career.

134.    Plaintiff DiFonzo assured Ms. S that any such conduct was unthinkable.

135.    Defendant Ortt-Gawrys subsequently forbade whispering in the Sheriff's Forensic Laboratory, and sent out a memo to that effect after publicly yelling at Plaintiffs for talking in low tones about work-related matters.

136.    Defendant Ortt-Gawrys would try to embarrass Plaintiff DiFonzo by coming into their workspace area with a drug chemistry question about standards, and asking Ms. K, who was new to this area, and was not as familiar with standards, instead of asking Plaintiff DiFonzo, her supervisor, who was present and an expert. Ms. K was uncomfortable with these interactions, and would frequently apologize to Plaintiff DiFonzo.

137.    Defendant Ortt-Gawrys regularly referred to Plaintiff DiFonzo as "the asshole," and Plaintiff Rogers as "the entitled little bitch."

138.    During COVID, the Forensic Laboratory went to a split shift. Deputy Chief Weidel instructed Defendant Ortt-Gawrys to put Plaintiffs on the same schedule to limit the possibility of spreading the virus, since they were part of the same family.

139.    Defendant Ortt-Gawrys unreasonably refused to pair them up, as part of her plan to harass Plaintiffs, an action which was approved by Defendants; Deputy Chief Weidel signed off on the weekly timecards.

140.    Conduct along these lines occurred on a daily basis from early August 2019 through the Fall and Winter of 2019. Plaintiffs were demeaned, embarrassed, set up for failure, and otherwise treated in an abusive and illegal manner.

141.   In March 2020, the situation escalated to the point where Defendants NCSO and Filicetti, and Deputy Chief Weidel, Defendant Ortt-Gawrys' supervisor, stepped in to meet with Plaintiff DiFonzo and Defendant Ortt-Gawrys.

**Plaintiff DiFonzo Expressly Advises Defendants County of Niagara, NCSO, and Filicetti In March 2020 that both He and Plaintiff Rogers Are Being Retaliated Against by Defendant Ortt-Gawrys**

142.   NCSO Deputy Chief Weidel asked to meet with Plaintiff DiFonzo and Defendant Ortt-Gawrys in March 2020.

143.   Plaintiff DiFonzo indicated that he was uncomfortable meeting with Deputy Chief Weidel while Defendant Ortt-Gawrys was present.

144.   Plaintiff DiFonzo therefore met alone with NCSO Deputy Chief Weidel.

145.   At the meeting, Deputy Chief Weidel indicated that he was aware of problems between Defendant Ortt-Gawrys and Plaintiff.

146.   Plaintiff DiFonzo immediately told Deputy Chief Weidel that the animosity stems from an incident at the end of July 2019 when he refused to sign off on Ms. K's training as a drug chemist, and when he had advised Defendant Ortt-Gawrys that what she did was wrongful and unethical. He told Deputy Chief Weidel that he reiterated his concerns in August 2019 when returned from being out of the office and learned that Ms. K had been prematurely and improperly signed off for drug chemistry. He told Deputy Chief Weidel that Defendant Ortt-Gawrys' decision would have far-reaching implications.

147.   Plaintiff DiFonzo also told Deputy Chief Weidel that Defendant Ortt-Gawrys' choice to approve Ms. K as a drug chemist would jeopardize casework at the laboratory, and impact the prosecution of cases in Niagara County.

148.    Plaintiff DiFonzo believed the unethical and improper approval was a public safety and health threat.

149.    Plaintiff DiFonzo told Deputy Chief Weidel at the March 2020 meeting that he believed the issue between him and Defendant Ortt-Gawrys was motivated by, and in retaliation for, Plaintiff DiFonzo speaking up about the unethical and wrongful decision to approve Ms. K as a drug chemist.

150.    NCSO Deputy Chief Weidel dismissed Plaintiff DiFonzo's concerns.

151.    NCSO Deputy Chief Weidel told Plaintiff DiFonzo that the problem seemed like a difference of opinion, or two people not getting along, and told him to try to get along.

152.    Deputy Chief Weidel then told Plaintiff DiFonzo a story about a time when he was in Plaintiff's shoes and did not get along with a co-worker. He told Plaintiff DiFonzo that he just had to try to get along with the co-worker, just like he did, and that Plaintiff DiFonzo must avoid embarrassing his daughter.

153.    Plaintiff DiFonzo immediately corrected NCSO Deputy Chief Weidel and advised him that the situation was not the same as the one he experienced. Plaintiff and Defendant Ortt-Gawrys were not co-workers, but rather supervisor and supervisee, and that her conduct was out of bounds.

154.    Further, Plaintiff DiFonzo advised Deputy Chief Weidel at the March 2020 meeting that Defendant Ortt-Gawrys was humiliating Plaintiffs, that it was constant, and that she was going after both Plaintiff and his daughter, Plaintiff Rogers.

155.    Plaintiff DiFonzo specifically tied the abuse directed at both him and Plaintiff Rogers to his speaking up about the unethical and wrongful approval given to Ms. K.

156.    Plaintiff DiFonzo told NCSO Deputy Chief Weidel that Defendant Ortt-Gawrys was

continuously doing things to embarrass and demean him.

157.   Plaintiff DiFonzo also told NCSO Deputy Chief Weidel that Defendant Ortt-Gawrys constantly undermined him, and he gave examples, such as the laboratory director asking chemistry questions of his less-knowledgeable subordinates only, when he was present in the conversation and the person most qualified to answer the question.

158.   Moreover, at the March 2020 meeting, Plaintiff DiFonzo specifically told NCSO Deputy Chief Weidel that the situation was not a matter of two people not getting along; it had escalated to constant abuse and humiliation, and treatment far different from the other chemists in the Forensic Laboratory.

159.   Plaintiff DiFonzo told Deputy Chief Weidel at the March 2020 meeting that he did not know what to do and he needed help.

160.   Plaintiff DiFonzo told Deputy Chief Weidel that Plaintiffs wanted to be treated equal to Ms. K, which was not happening.

161.   NCSO Deputy Chief Weidel again told Plaintiff that he must try to get along because Defendant Ortt-Gawrys was in charge of the Sheriff's Forensic Laboratory, not him.

162.   Despite being specifically advised at the March 2020 meeting that the situation was not a matter of typical workplace discord, and that Defendant Ortt-Gawrys was targeting both him and his daughter as a result of Plaintiff speaking up about the unethical and wrongful approval given to Ms. K, NCSO Deputy Chief Weidel continued to dismiss Plaintiff DiFonzo's concerns about the unethical and wrongful retaliatory actions taken by Defendant Ortt-Gawrys.

163.   Over the next eighteen months, as the abuse, retaliatory conduct, and humiliation

escalated, Plaintiff DiFonzo was repeatedly told by Defendants County of Niagara, NCSO, Filicetti, and Deputy Chief Weidel to tolerate the abuse and harassment, and to "try to get along."

**The Retaliation and Abuse Escalates: Demotion, Refusal to Promote**

164.    Plaintiff DiFonzo was demoted by Defendants within two weeks of the March 2020 meeting.

165.    Plaintiff DiFonzo was stripped of his Assistant Lab Director title by Defendants.

166.    Plaintiff DiFonzo's access to POSS and COSS was restricted.

167.    Plaintiff DiFonzo was not even able to see his supervisees' schedules.

168.    His supervisee, Ms. K, however, was subsequently granted access by Defendants and able to see and review Plaintiff DiFonzo's schedule. Ms. K. was then authorized to approve Plaintiff DiFonzo's time off, as well as all briefing time and pay.

169.    To compound matters, for a short time, Defendants inadvertently removed Plaintiff DiFonzo's access to all NCSO systems, which prevented him from accessing his supervisees' schedules, all information at the Forensic Lab, his own information, or from entering time or clocking in, all of which caused him distress.

170.    NCSO Deputy Chief Weidel fixed the issue, but restored only part of Plaintiff DiFonzo's access, and information only relating to his own schedule. Plaintiff DiFonzo was no longer able to access information associated with his position of Assistant Lab Director, nor was he able to access any information for the individuals he continued to supervise.

171.    Several other responsibilities were taken away from Plaintiff DiFonzo, including the ability to approve time cards, vacation leave, and scheduling.

172.    Defendants then gave Ms. K, Plaintiff DiFonzo's supervisee, all the access to the POSS and COSS systems that Plaintiff DiFonzo previously had.

173.    Defendants gave Ms. K the authority to approve Plaintiff DiFonzo's briefing time and pay, even though Plaintiff DiFonzo was her supervisor.

174.    Adverse employment actions were also taken against Plaintiff Rogers.

175.    Plaintiff Rogers graduated from Niagara University with a bachelor's of science in biochemistry.

176.    Plaintiff Rogers was initially hired as a Criminalist I.

177.    Prior to the incident in 2019 when Plaintiff DiFonzo told Defendant she was acting unethically and wrongfully by approving Ms. K as a drug chemist, Plaintiff Rogers was assured by Defendant Ortt-Gawrys and Defendants that if she completed specialized training offered by the Bureau of Alcohol, Tobacco, and Firearms ("ATF"), she would be promoted to Criminalist II or Firearms II.

178.    The position of Criminalist II or Firearms II had a higher rate of pay.

179.    Every other chemist in the Forensic Laboratory, most of whom had less training than Plaintiff Rogers, was listed and paid as Criminalist II.

180.    Plaintiff Rogers successfully completed extensive advanced training throughout 2017 and 2018, and then periodically through 2020 for both maintenance and additional specialties. Some of her training was offered to only a handful of individuals across the United States. All of her training was outside of Western New York.

181.    Some of Plaintiff Rogers' training is so specialized that only ten people in the United States are selected for it each year.

182.    Defendant Niagara County invested more than $100,000 in Plaintiff Rogers'

professional development.

183.    After the incidents at the end of July and early August 2019, and after Plaintiff Rogers had already successfully completed the training needed for a promotion, Defendants refused to promote Ms. Rogers to the position of Criminalist II or Firearms II.

184.    Upon information and belief, Defendant Ortt-Gawrys told people in the Sheriff's Forensic Laboratory that she would not promote Plaintiff Rogers because "she didn't want to."

185.    Defendant Ortt-Gawrys offered several nonsensical excuses to Plaintiff Rogers when Plaintiff attempted to find out why she was not being promoted, despite meeting and exceeding the qualifications for the Firearms II position.

186.    At one point, Defendant Ortt-Gawrys pretended to advertise for a Firearms II position by leaving an advertisement in the printer.

187.    When another employee brought the advertisement to Defendant Ortt-Gawrys, thinking it was a mistake that she left it out, Defendant Ortt-Gawrys instructed her to return it to the printer so that Plaintiffs would find it and be upset. Defendant Ortt-Gawrys wanted to ensure that Plaintiffs knew Plaintiff Rogers would never get the promised promotion.

188.    Defendants knew or should have recognized that one of their most highly trained civilian experts, Plaintiff Rogers, was not being promoted in accordance with her training and experience.

189.    Defendant Ortt-Gawrys looked for other ways to harass, provoke, upset, or otherwise abuse Plaintiffs.

190.   Defendant Ortt-Gawrys detailed her schemes in more than two thousand text messages to staff members at the Sheriff's Forensic Laboratory, including Ms. K and Ms. S, who began to share those texts with Plaintiffs.

191.   The texts contained humiliating and negative opinions or false statements about Plaintiffs, as well as Defendants Ortt-Gawrys' desire to force them to resign.

192.   The harassment continued throughout 2020. In June 2020, Defendant Ortt-Gawrys instructed Plaintiff DiFonzo to sign up for a training class that he had already taken.

193.   Plaintiff DiFonzo cleared the days on his schedule.

194.   When he went to take the class, he found out that Defendant Ortt-Gawrys was playing a hoax on him, and told people she just wanted to see his face when he got there and was not signed up.

195.   Each and every Defendant knew that the situation had escalated beyond what is reasonable or acceptable. A mutual friend, out of concern for Plaintiffs, even called Defendant Filicetti in 2020 to advise him that Plaintiffs were being unjustifiably harassed; Defendant Filicetti indicated that he was aware of the situation and that Plaintiff DiFonzo was not in trouble.

196.   Moreover, Plaintiff DiFonzo had informal conversations with NCSO Deputy Chief Weidel where he told Weidel, his supervisor's supervisor, that he was trying to foster a professional work environment, but things were not going well.

197.   In the Fall of 2020, Defendant Ortt-Gawrys  prepared a written reprimand of Plaintiff DiFonzo, and reported him as "insubordinate" for not attending a class. This negative review, his very first in twenty-five years, triggered a verbal discussion with Defendant Ortt-Gawrys that ended in another meeting with Defendants.

198.   Upon information and belief, in twenty-five years, no employee of the Sheriff's Forensic Lab had ever been disciplined or written up except Plaintiffs DiFonzo and Rogers.

### The September 3, 2020 Meeting; Defendants are Again Expressly Notified About Retaliation

199.   The meeting between Defendants and Plaintiff DiFonzo took place on September 3, 2020. Once again, NCSO Deputy Chief Weidel was present, along with Defendant Ortt-Gawrys and a union representative, Brian Bloom.

200.   Instead of asking Plaintiff DiFonzo whether the failure to attend training charge was true, Plaintiff DiFonzo was reprimanded for "failing to get along" with the lab director, Defendant Ortt-Gawrys, and for being "argumentative."

201.    Plaintiff DiFonzo advised Defendants that Defendant Ortt-Gawrys had lied about him not attending the class, which she then admitted.

202.   Plaintiff DiFonzo attempted to address the continuing harassment, unequal treatment, and malicious conduct directed towards him and Plaintiff Rogers.

203.   Plaintiff DiFonzo once again notified Defendants that the wrongful conduct stemmed from him speaking up at the end of July 2019 and early August 2019, when he expressed grave concerns about Ms. K being certified when she was not ready, and the obvious ethical and public health and safety impacts.

204.   Plaintiff DiFonzo was immediately and forcibly shut down by Defendants.

205.   Plaintiff DiFonzo was warned that his career was on the line.

206.   The next step, Defendants advised Plaintiff DiFonzo, would be a leave of absence or job termination.

207.   All of Plaintiff DiFonzo's concerns were dismissed.

**Escalation Continues; Plaintiff Rogers Is Punished and Placed in Harm's Way**

208.    The malicious actions and harassment against Plaintiffs DiFonzo and Rogers continued to escalate.

209.    In the Fall of 2020, Defendant instructed employees not to help Plaintiff DiFonzo in any way because "he's not our friend."

210.    Plaintiffs endured daily harassment from Defendant Ortt-Gawrys, much of which was known to Defendants.

211.    For example, Defendant Ortt-Gawrys violated Plaintiffs' privacy in a manner that was highly offensive to him.

212.    Defendant Ortt-Gawrys took pictures of Plaintiff DiFonzo's paycheck, which included both his salary and overtime and other hours, as well as other private information, and complained to Plaintiff DiFonzo's supervisees that he made too much money. Defendant Ortt-Gawrys' conduct was highly offensive to Plaintiff DiFonzo and was meant to embarrass him.

213.    Defendant Ortt-Gawrys opened what she knew to be Plaintiff DiFonzo's concealed carry permit, which had been delivered to his desk, and speculated to the administrative staff, including Plaintiff DiFonzo's supervisees, that he must be getting ready to leave his law enforcement career with the NCSO since he applied for the permit. Defendant Ortt-Gawrys' conduct was highly offensive to Plaintiff DiFonzo and was meant to embarrass him.

214.    Defendant Ortt-Gawrys called the Erie County Forensic Laboratory and spoke negatively about Plaintiff DiFonzo and impugned his reputation.

215.    In May 2021, Defendant Ortt-Gawrys instructed the staff to attend a criminal trial

and observe Plaintiffs as they provided testimony in a criminal case.

216.    This trial was Plaintiff Rogers' first time testifying as a firearms expert.

217.    After the testimony concluded, Defendant Ortt-Gawrys asked the staff to review both Plaintiffs.

218.    When Ms. K prepared a positive review of Plaintiff DiFonzo, Defendant Ortt-Gawrys prevailed upon that employee to change her review and unjustifiably give him a negative one. This request upset the employees, and they relayed their concern to Plaintiff DiFonzo. Ms. K refused to follow the request to give Plaintiff DiFonzo an undeserved negative review.

219.    In May 2021, an incident occurred that resulted in further retaliation directed at Plaintiffs.

220.    Defendant Ortt-Gawrys began requesting that certain officers' drug cases be given priority over the rest of the Sheriff's Forensic Laboratory's caseload.

221.    Plaintiff DiFonzo questioned why Defendant Ortt-Gawrys was receiving drug evidence directly from these same police officers in her office.

222.    Defendant Ortt-Gawrys then installed paper over the windows to her office so that nobody could see inside when she had a visitor.

223.    Plaintiff DiFonzo indicated that these private visits and her receipt of evidence directly from these officers, particularly when these officer' matters were then given preferential treatment, was another concern that could compromise the integrity of the Forensic Laboratory.

224.    Defendant became enraged by Plaintiff DiFonzo's expression of concern and ethics.

225.    In June 2021, when Plaintiff DiFonzo was out of the office for a week, Plaintiff

Rogers was given her first negative performance review.

226.    The grounds for the review were a pretext for Defendant Ortt-Gawrys' retaliation towards Plaintiff DiFonzo.

227.    Plaintiff Rogers was written up because she was supposedly a week behind on a sampling plan, and because she supposedly did not respond in writing to an email from Defendant Ortt-Gawrys.

228.    The sampling plan deadline was an artificial deadline that was unreasonable; the failure to respond charge was untrue.

229.    In both instances, Plaintiff Rogers had previously verbally addressed the concern with Defendant Ortt-Gawrys.

230.    During the meeting between Plaintiff Rogers and Defendant Ortt-Gawrys to discuss the unjustifiably negative review, Defendant Ortt-Gawrys specifically mentioned Plaintiff DiFonzo's decision to speak up in August 2019 about the unethical and unlawful decision to approve Ms. K as a drug chemist.

231.    Plaintiff Rogers attempted to clarify the grounds for the negative review, but was told there would be no further discussion, and that she was being "argumentative," which could result in further adverse employment actions.

232.    At the bottom of the review, Defendant Ortt-Gawrys listed a recommended action to address Plaintiff Rogers' supposed infractions.

233.    The recommended action was to permanently move Plaintiff Rogers' desk to the isolated firearms room, where firearms are discharged for testing purposes.

234.    According to Defendant Ortt-Gawrys, the idea to relegate Plaintiff Rogers to the Firearms room originated with NCSO Deputy Chief Weidel.

235.   Deputy Chief Weidel also reviewed Plaintiff Rogers' written negative performance review containing the punitive action and expressly approved and signed off on it.

236.   Deputy Chief Weidel did, in fact, review the written performance review with the punishment because he sent it back to be initialized by Plaintiff Rogers.

237.   The firearms room contains lead in the walls, ceiling, and floors.

238.   The firearms room is a toxic environment, and is in no way safe for anyone for an extended period of time, and certainly not for forty hours or more each week.

239.   The firearms room is for firing weapons, and not for prolonged working or for the permanent location of a desk work area.

240.   Plaintiff Rogers asked if they could further discuss the punishment.

241.   Defendant Ortt-Gawrys refused, and said that "the bosses," meaning NCSO Deputy Chief Weidel, the NCSO Undersheriff, and Defendant Filicetti, had already agreed and signed off on her punishment.

242.   Defendants signed her negative performance review, and reviewed and approved the recommended punitive action to move Plaintiff to the firearms room.

243.   Plaintiff Rogers' desk and belongings were immediately moved to the firearms room.

244.   Defendants intentionally placed Plaintiff Rogers in danger. The action was taken by her supervisors, and with the express approval of all Defendants.

245.   Claimant was isolated in the firearms room out of spite and in retaliation for Deputy DiFonzo's decision to speak up about the unethical choices made by the lab director and Defendants.

246.   Defendants placed Plaintiff Rogers in harm's way and punished both Plaintiffs out

of malice and in retaliation for Plaintiff DiFonzo speaking up about Defendants' unethical and wrongful choice to approve Ms. K as a drug chemist before she was trained.

247.   Plaintiff Rogers checked with the Erie County forensic laboratory to see whether anyone had ever heard of an employee being punished in this manner.

248.   Plaintiff Rogers' counterparts in Erie County were appalled that she would be moved to the firearms room because the room posed a serious health risk.

249.   Plaintiff Rogers feared she would lose her job and suffer both reputational and professional harm, as well as further retaliation, if she refused.

250.   Plaintiff Rogers was aware that Defendant Ortt-Gawrys made numerous threats about their job security, her connections with a state senator, Defendants' approval of her treatment of Plaintiffs, and the fact that Defendants had unreasonably and pointedly refused to listen to Plaintiff DiFonzo's notices that Plaintiffs were being targeted.

251.   Plaintiff Rogers begged Plaintiff DiFonzo not to challenge the punishment because Plaintiff Rogers knew that worse adverse employment actions would follow.

252.   In fact, after she was moved to the firearms room, Defendant Ortt-Gawrys told Plaintiffs and the staff that her brother, Senator Rob Ortt, was going to be helping fund some of the police academy and may run for governor, so the administration, including Defendants, would do what she wanted.

253.   These comments were meant to intimidate Plaintiffs, and did in fact deter them from further speaking up about the premature certification of Ms. K, and from challenging the unfair and unjustified performance review, refusal to promote, and other adverse or punitive actions.

254.    After the move to the firearms room, the daily pattern of abuse and harassment continued. On one occasion, Defendant Ortt-Gawrys physically threw files at Plaintiff Rogers.

255.    On another occasion, she told Plaintiff Rogers that if she ever became pregnant, she would force her to stay in the firearms room and continue to fire weapons, unlike the temporary leave granted to an Erie County counterpart.

256.    This threat exemplified the level of malice that was directed at Plaintiffs and caused much distress to Plaintiffs.

257.    This escalating negative treatment and obvious malice towards Plaintiffs caused them emotional and physical distress.

258.    In June 2021, a female Sheriff's deputy was promoted to Lieutenant. Defendant Ortt-Gawrys told Plaintiff DiFonzo's supervisees, including Ms. S., that Plaintiff DiFonzo stated that the female deputy was only promoted because she provided "----jobs" to the administration members down the hall, in other words the Sheriff, Undersheriff, or Deputy Chief.

259.    Further, Defendant Ortt-Gawrys told Plaintiff DiFonzo's supervisees that Plaintiff DiFonzo could not stand working for women, had previously advised her to not hire Ms. S, and that he did not like Ms. K.

260.    All of those statements by Defendant Ortt-Gawrys were false. Plaintiff DiFonzo has never stated or implied that the female officer was promoted for any untoward reason, nor did he oppose Ms. S's hiring, or hold any animosity towards either Ms. S or Ms. K.

261.    In September 2021, the newly-promoted female deputy confronted Plaintiff DiFonzo about the false statement of fact being spread by Defendant Ortt-Gawrys.

Plaintiff DiFonzo explained that the statement was false, and that Defendant Ortt-Gawrys was trying to harm his reputation.

262.    Defendant Ortt-Gawrys false statements of fact reached numerous people, including Defendants who joked that they must have been absent the day these alleged activities took place. Defendants were well aware that Defendant Ortt-Gawrys was maliciously spreading false statements about Plaintiff DiFonzo.

263.    Plaintiff DiFonzo was mortified that anyone would hear such a false statements about him, particularly ones that were so demeaning to a respected colleague. Defendants took no action against Defendant Ortt-Gawrys for spreading these false statements, acting unprofessional, or for her inability to responsibly manage or supervise employees.

**Defendants Failed to Properly Investigate Plaintiffs' Concerns and Retained Defendant Ortt-Gawrys Long After They Knew of Her Harassment and Abuse**

264.    Defendants were informed on multiple occasions, including officially on March 2020 and September 2021, as well as informally, that Defendant Ortt-Gawrys was targeting Plaintiffs and retaliating against them in retaliation for Plaintiff DiFonzo raising the public health, ethics, and safety alarm.

265.    Defendants unreasonably and deliberately chose to disregard the legitimate and substantiated concerns of Plaintiff DiFonzo, an employee who had previously enjoyed a spotless and remarkable twenty-five year record of service.

266.    Defendants unreasonably and deliberately chose to disregard the legitimate and substantiated concerns that Plaintiff DiFonzo raised on behalf of his subordinate employee, Plaintiff Rogers, who also, until the incident that triggered the retaliation, had a spotless and exemplary performance record with Defendants.

267.   Defendants knew that the actions of their supervisor, Defendant Ortt-Gawrys, were unethical, illegal, and motivated by a desire to punish Plaintiffs for calling out unethical conduct that could have a long-lasting effect on public health, ethics, and safety.

268.   Defendants unreasonably and deliberately chose to disregard concerns about irregularities at the Sheriff's Forensic Laboratory, and instead threatened to terminate Plaintiff DiFonzo's employment or place him on leave when he tried to raise them again in September 2021.

269.   Defendants, individually and through the actions of their supervisor, Defendant Ortt-Gawrys, demoted Plaintiff DiFonzo, removed significant responsibilities, spread false information that he could not work for a woman, failed to take action when he specifically told them why he was being targeted and harassed by Defendant Ortt-Gawrys, and otherwise perpetuated a two-year period of harassment, abuse, and targeted wrongful conduct directed at Plaintiffs.

270.   Defendants, individually and through the actions of their supervisor, Defendant Ortt-Gawrys, took part in the jaw-dropping decision to punish Plaintiff Rogers by permanently moving her to the toxic firearms room. Defendants signed off on this punishment, as well as the bogus negative performance review.

271.   Defendants had every opportunity to intervene, retrain Defendant Ortt-Gawrys, restrain Defendant Ortt-Gawrys, address the punishments, investigate the toxic and threatening atmosphere that pervaded the Sheriff's Forensic Laboratory, but chose not to.

272.   Defendants approved of Defendant Ortt-Gawrys' conduct, approved of her decisions, signed her unjustified reviews of Plaintiffs, kept her employed, and otherwise

provided her with the means and authority to carry out her sustained and malicious pattern of abuse against Plaintiffs, all of which caused Plaintiffs incredible and unnecessary stress and anxiety.

273.    Defendants specifically signed off on all demotions, failures to promote, and removals of responsibilities.

274.    Defendants silenced Plaintiffs.

275.    Defendants ignored Plaintiff DiFonzo's repeated concerns about the integrity of the Forensic Laboratory, ignored the fact that Defendant Ortt-Gawrys had compromised the Forensic Laboratory in numerous ways, and otherwise made it clear that they did not care that the misconduct stemmed Plaintiff DiFonzo speaking up to raise a public health, ethics, and safety concern.

## Plaintiff Rogers Is Forced to Resign

276.    Defendants were all fully aware, or should have been aware, of the horrendous work environment and patterns of abuse directed at Plaintiffs in the Forensic Laboratory.

277.    Defendants failed to properly investigate until it was too late - after Plaintiffs were forced to resign or retire - and otherwise chose to ignore the wrongful actions and behavior of its employees and agents for a two-year period. Defendants failed to retrain Defendant Ortt-Gawrys, fire her, or otherwise restrain her.

278.    Plaintiff Rogers was forced to resign on August 9, 2021.

279.    Plaintiff Rogers did not want to resign her position, but felt she had no choice. She had been driven to the point where no reasonable person could withstand the abuse directed at her that stemmed from her father's exercise of his First Amendment rights.

280.    She knew that Plaintiff DiFonzo was also left with no choice but to resign, and she

asked him to hold off so that she would not be unprotected while he was absent.

281.  After Plaintiff Rogers announced her resignation, Defendant Ortt-Gawrys told laboratory employees "one down, one to go."

282.  Upon information and belief, Defendant Ortt-Gawrys expressed surprise that Plaintiffs had not already sued her for her mistreatment of them, adding that she'd been a b----- to them.

283.  During Plaintiff Rogers' exit interview, at which Defendants Filicetti and Deputy Chief Weidel and Undersheriff Dunn were present, she was too traumatized to discuss the details of why she was leaving, and told Defendants that "she was uncomfortable talking about it."

284.  Defendants Filicetti, NCSO, Deputy Chief Weidel, and Undersheriff Michael Dunn were all part of the approval process for these disciplines, demotions, and refusals to promote, and all were aware of the multiple reports Plaintiff DiFonzo made about the retaliatory conduct and the reasons for the retaliation. To Plaintiff Rogers, the individuals at the exit interview were all part of the problem, and she was not comfortable discussing the abuse and retaliation with them.

285.  Defendants never communicated with Plaintiff Rogers after she left, although she has been asked to provide expert testimony in criminal cases in County of Niagara.

286.  Plaintiff Rogers provided testimony, but suffered anxiety attacks in the weeks, days, and hours leading up to the testimony.

287.  Afterwards, the testimony and the anxiety surrounding her interactions with her former colleagues took a tremendous toll on her mental health.

288.  The pattern of abuse and retaliatory conduct against both Plaintiffs was outrageous

and known to all employees and Defendants alike.

289.   The pattern of abuse and mistreatment has destroyed Plaintiff Rogers' confidence, left her second guessing her procedures, and has otherwise impeded her ability to work in a professional environment.

290.   Plaintiff Rogers has been traumatized by the two-year ordeal of malicious abuse, which was approved by all Defendants, and perpetuated by them, and she is unable at the present time to resume her career in the forensic field.

291.   Plaintiff Rogers has experienced sleeplessness, stress-induced physical effects, and extreme anxiety as a result of the two-year ordeal.

**Plaintiff DiFonzo Is Forced to Resign**

292.   Defendants were all fully aware, or should have been aware, of the horrendous work environment and two-year pattern of abuse and retaliatory conduct that occurred in the Sheriff's Forensic Laboratory.

293.   Defendants failed and refused to properly investigate until it was too late, failed to retrain Defendant Ortt-Gawrys, failed to respond to Plaintiff DiFonzo's formal and informal notices that he was being retaliated against, and otherwise chose to ignore the wrongful actions and behavior of its employees and agents.

294.   Plaintiff DiFonzo was forced to retire early in September 2021.

295.   Plaintiff DiFonzo did not want to retire early and leave a long and distinguished career, but he had been driven to the point where no reasonable person could withstand the abuse that stemmed from the exercise of his First Amendment rights.

296.   Even after giving his retirement notice, and while he was still working in the Forensic Laboratory, Defendant Ortt-Gawrys continued to threaten to fire him if she

caught him whispering to anyone in the Forensic Laboratory.

297. She also threatened to fire the other Forensic Laboratory employees if they talked to Plaintiff DiFonzo.

298. Plaintiff DiFonzo was in constant fear that, despite already giving his forced retirement notice, he would lose his pension, or that people would be fired because they talked to him.

299. Plaintiff DiFonzo met with Defendant County of Niagara's human resources to express his fear that Defendant Ortt-Gawrys would impact his now-reduced pension.

300. During this two-year ordeal, Plaintiff DiFonzo was admitted to the hospital for stress-induced effects, and has repeatedly had to deal with extreme emotional upheaval, particularly with respect to what Defendants have done to his daughter's promising career.

301. Defendant DiFonzo, as the father of two high-achieving daughters, has prided himself on championing the involvement of women in science and in the field of forensics.

302. Since this ordeal, Defendant DiFonzo has had to endure questions from colleagues about his attitudes towards women, and, the stigma of "not being able to work for a woman," which could not be further from the truth.

303. The pattern of abuse and mistreatment has severely affected Plaintiff DiFonzo's entire family, and negatively affected both his confidence and his previously stellar reputation.

304. Plaintiff DiFonzo has been deeply affected by the two-year ordeal of malicious abuse, which was approved by all Defendants, and perpetuated by them.

305.    Plaintiff DiFonzo has also lost pension and other salary benefits.

306.    Since his departure, Plaintiff DiFonzo has continued to support the Sheriff's Forensic Laboratory by providing expert testimony in various criminal trials. He has provided this work out of concern for the integrity of the criminal justice system.

**Defendant Ortt-Gawrys Resigns**

307.    Upon information and belief, on September 3, 2021, after Plaintiffs were forced to resign, Defendant Ortt-Gawrys was placed on administrative leave; she resigned her position with Niagara County on September 17, 2021.

308.    Ms. S has since resigned. Upon information and belief, her resignation relates to ethical concerns.

**Defendants' Attempts to Rectify the Premature and Unethical
Approval of Ms. K**

309.    Defendants attempted to rectify the deficiencies with Ms. K's training by asking Plaintiff DiFonzo to sign off on Ms. K's approximately three-page training binder before he was forced to leave the Defendants' employ.

310.    Plaintiff DiFonzo refused.

311.    Defendants then attempted to rectify the deficiencies with Ms. K's approximately three-page binder by asking another County of Niagara employee, Paul Meyers, to sign off on Ms. K's training binder.

312.    Defendants were advised by Paul Meyers that Plaintiff could not sign off on the training binder because it would constitute back-dating the training binder, which is unethical.

313.    Paul Meyers has also resigned from the Sheriff's Forensic Laboratory.

314.    After Plaintiffs were no longer employed by Defendants, Ms. K contacted Plaintiff

DiFonzo and asked that he back-date her binder and sign off on her training for drug chemistry.

315.   Plaintiff DiFonzo refused because it is illegal and unethical to after-the-fact attempt to complete a training binder for a lab employee.

### COUNT I
### Retaliation for the
### Exercise of First Amendment Rights

316.   Plaintiffs reallege and incorporate herein by reference each and every allegation contained in ¶¶ 1 through 315 above.

317.   The First Amendment of the United States Constitution states that "Congress shall make no law . . . abridging the freedom of speech, or of the press." U.S. Const. Amend. I.

318.   The First Amendment restricts the government from retaliating against individuals based on what they say or write.

319.   The Supreme Court has held that speakers are protected against all government agencies and officials, including federal, state, and local, and legislative, executive, and judicial.

320.   Every person who, "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . ." 42 U.S.C.A. § 1983 (West)

321.   Defendants retaliated against Plaintiffs DiFonzo and Rogers on the basis of

DiFonzo's protected speech in violation of the First Amendment.

322.   Defendants' conduct is attributable to individuals acting under color of state law or authority because Defendants County of Niagara and Updegrove are County of Niagara governmental entities acting under color of state authority; Defendants NCSO and Filicetti are County of Niagara law enforcement officials acting under color of state authority; and Defendant Ortt-Gawrys is employed by Defendants and at all times acted under color of state law or authority. Each of those Defendants approved of the malicious and abusive acts directed at Plaintiffs, including Plaintiff DiFonzo's demotion, removal of responsibilities, and unequal treatment, and Plaintiff Rogers' punishment in the toxic firearms room, illegitimate reviews, unequal treatment, and other abusive acts, as detailed above.

323.   Defendants' conduct deprived the plaintiffs of a right guaranteed under the Constitution of the United States, including freedom of speech rights arising under the First Amendment.

324.   Beginning at the end of July 2019 and early August 2019, and based on his concerns for the public's health and safety, as well as the integrity of the law enforcement process, Plaintiff DiFonzo opposed, objected to, and reported the decision to prematurely and unethically certify Ms. K. in drug chemistry.

325.   If a drug chemist in Defendants' Forensic Laboratory lacks qualifications in drug chemistry, there are serious ramifications for the integrity of all evidence taken in by the NCSO Forensic Laboratory, the prosecution of criminal actions, and laboratory certification, as well as the possibility that a guilty person could escape prosecution based on faulty determinations, or, more importantly, that an innocent person could be

wrongly convicted of a crime.

326.   Plaintiff DiFonzo knew of one instance where Ms. K misidentified a powder substance, that, if not caught by him, could have resulted in the conviction of an innocent person.

327.   Plaintiff DiFonzo spoke as a private citizen on a matter of public concern.

328.   Plaintiff DiFonzo's speech was motivated out of concerns for the integrity of the criminal justice system, including the possibility of an innocent person being convicted for a crime he or she did not commit, or a guilty person being freed despite committing crimes.

329.   Plaintiff DiFonzo's speech was made as a private citizen because his concern centered around the integrity of the criminal justice system, and his fear that an innocent person could be convicted or a guilty person freed.

330.   Plaintiff DiFonzo's speech, which was made as a private citizen, was protected by the First Amendment of the United States Constitution.

331.   Defendants retaliated against Plaintiffs as a direct result of the exercise of Plaintiff DiFonzo's First Amendment rights.

332.   The retaliation began with Defendant Ortt-Gawrys. She expressed anger directed at Plaintiff DiFonzo after Plaintiff spoke out against the unethical and improper certification of Ms. K based on public safety and health concerns, and then mounted a two-year escalating and malicious campaign of harassment directed at both Plaintiffs.

333.   As the retaliation escalated, Plaintiff provided notice to all Defendants, by following the chain of command, that Plaintiffs were being maliciously targeted because Plaintiff DiFonzo spoke up about the unethical and improper certification of Ms. K. Plaintiff

DiFonzo provided examples to the supervisors in the chain of command, and repeatedly told them that Defendant Ortt-Gawrys' actions were abusive and beyond what is acceptable in a workplace. Plaintiff DiFonzo went so far as to correct Defendants when they tried to explain away the retaliatory conduct as an inability to get along or a personality clash.

334.    All Defendants had decision and policy-making authority over Ortt-Gawrys and Plaintiffs, and could have refused to condone her malicious campaign of abuse directed towards Plaintiffs, or fired her, or otherwise restrained or retrained her.

335.    Defendants did not restrain Ortt-Gawrys, or take any other action, until Plaintiffs had no choice but to resign, but instead authorized, enabled, endorsed, condoned, and approved of Defendant Ortt-Gawrys' actions.

336.    Further, Defendants approved of Plaintiff DiFonzo's demotion and change in responsibilities, condoned the malicious acts of abuse, threatened Plaintiff DiFonzo with suspension or job loss if he complained further, and approved of Plaintiff Rogers' physically hazardous punishment in the firearms room.

337.    Defendants retaliated and took adverse action against Plaintiff DiFonzo by harassing, demoting, demeaning, defaming, disparaging, unjustifiably reprimanding, perpetrating hoaxes on him, violating his privacy, engaging in a concerted effort to force him to resign, which resulted in his early retirement and constructive termination, and by physically, emotionally, and professionally harassing and punishing his daughter, Plaintiff Rogers. Defendants engaged in this pattern of conduct in a sustained and continuous manner for over two years. Plaintiff DiFonzo was left with no choice but to resign his position, thus ending a long and distinguished career as a forensic

chemist for County of Niagara and NCSO.

338.   Defendants retaliated and took adverse action against Plaintiff Rogers by refusing to promote her, denying her the opportunity for more pay, unjustifiably reprimanding her, demeaning her in front of department staff, harassing her, disparaging her, and physically punishing her by moving her to an isolated toxic environment and endangering her health. Plaintiff was left with no choice but to resign her position. Defendants engaged in this pattern of conduct in a sustained and continuous manner for more than two years.

339.   Defendants disregarded Plaintiffs' repeated requests for help, and acted with deliberate indifference despite what they knew to be an abusive and toxic work atmosphere.

340.   Plaintiff DiFonzo provided appropriate notice on multiple occasions to Defendants, using the chain of command, and no action was taken to restrain Defendant Ortt-Gawrys, retrain her, or otherwise properly supervise her.

341.   Moreover, Defendant Ortt-Gawrys used the authority vested in her by Defendants to refuse to promote Plaintiff Rogers to a forensic criminalist II or firearms II, despite the fact that Plaintiff Rogers is eminently qualified. Defendant Ortt-Gawrys' refusal to promote Plaintiff Rogers was approved, condoned, and otherwise accepted by all Defendants.

342.   Defendants denied Plaintiff Rogers the opportunity to advance her career, earn more in compensation and benefits, and otherwise reap the benefits of her hard work and dedication.

343.   The above actions, including Defendants' failure to properly train, supervise, fire, or

restrain Defendant Ortt-Gawrys, as well as their acceptance, approval, and condoning of the actions detailed above, constitute gross negligence and deliberate indifference to Plaintiffs' constitutional rights in violation of 42 U.S.C. §1983 and the First Amendment, and directly subject all Defendants to liability.

344.   Defendants' conduct constitutes adverse employment actions for purposes of Plaintiffs' First Amendment retaliation and wrongful discharge claim because the conduct would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights, and did in fact deter Plaintiffs from further exercising their rights.

345.   As a result of the retaliatory conduct, Plaintiffs were in constant fear of termination, loss of pension, reputational and professional harm, and the like, and ultimately had no choice but to resign from their respective positions.

346.   There was a causal connection between the adverse action and the protected speech because Defendant Ortt-Gawrys' behavior changed almost immediately - within days and weeks - after Plaintiff DiFonzo raised his concerns about ethics, and public health and safety, and escalated each time he raised them; Defendant Ortt-Gawrys expressed considerable anger each time the subject of the improper certification of Ms. K and impropriety arose, and a series of adverse employment actions against Plaintiffs DiFonzo and Rogers always followed those angry outbursts.

347.   Moreover, during Plaintiff Roger's negative performance review in 2021, which was signed and verbally approved of by Defendants, Defendant Ortt-Gawrys specifically mentioned Plaintiff DiFonzo's end of July and early August 2019 exercise of his First Amendment right to free speech with respect to Ms. K's improper

certification, which was the impetus behind the two-year period of abuse and harassment.

348.    The causal connection is sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment actions. Plaintiffs had unblemished records with Defendants, and did not have any issues with Defendant Ortt-Gawrys prior to Plaintiff DiFonzo's exercise of the protected speech. None of these adverse employment actions would have been taken absent Plaintiff DiFonzo raising concerns about Ms. K's improper certification and, later, the impropriety of the police officers directly communicating with Defendant Ortt-Gawrys.

349.    Indeed, in a twenty-five year period, no other employee of the Forensic Lab had ever been disciplined or written up except Plaintiffs DiFonzo and Rogers.

350.    Defendants had no adequate justification for treating the Plaintiffs differently and abusively based on Plaintiff DiFonzo raising his concern from any other member of the general public.

351.    By demoting, failing to promote, punishing, demeaning, harassing, and otherwise forcing the discharge of Plaintiffs, Defendants violated Plaintiffs' right to freedom of speech guaranteed by the First Amendment of the United States Constitution.

352.    Plaintiffs have suffered damages as a result of the aforementioned harassment, abuse and constructive discharge, including the loss of retirement benefits, pay, career satisfaction, professional development, mental and physical health, and other losses and impacts on their respective families.

353.    Plaintiffs are entitled to damages, as well as an award of attorneys' fees and expenses as a result of the retaliatory conduct in violation of their constitutional rights.

**COUNT II**
**Defamation**
**By Plaintiff DiFonzo against All Defendants**

354.    Plaintiffs reallege and incorporate herein by reference each and every allegation contained in ¶¶ 1 through 353 above.

355.    Defendant Ortt-Gawrys made false statements of fact when she told people that Plaintiff DiFonzo attributed a police captain's success to her using "----jobs" to advance her career. Defendant Ortt-Gawrys also made a false statement of fact when she told the Forensic Laboratory staff members that Plaintiff DiFonzo opposed Ms. S's hiring and Ms. K's employment because he hated women. Defendants specifically told the Ms. S and other staff in the Forensic Laboratory that Plaintiff "did not want me to hire you [Ms. S]" because he hates women, or words to that effect. Defendant Ortt-Gawrys also made false statements of fact when she said that Plaintiff DiFonzo would "sabotage Ms. S's training and work," would teach her "incorrect standards," and that problems would develop later because he would train her with incorrect information, and other words to that effect.

356.    These false statements of fact were published to a third party when it was stated directly to Ms. K and Ms. S, as well as others in the Sheriff's Forensic Laboratory and NCSO.

357.    Plaintiff DiFonzo never uttered such statements, nor would he ever imply that a colleague was promoted as a result of anything but merit. He would never oppose any employee's hiring based on her gender or sabotage anyone's work.

358.    Defendant Ortt-Gawrys was not privileged or authorized to publish those false statements of fact.

359.   Defendant's false statements of fact caused special harm or defamation per se to Plaintiff DiFonzo, particularly because they questioned his integrity and competence in an arena where ethical conduct, integrity, expertise, and strong relationships with colleagues is paramount, and involves matters of life and death. *Dillon v. City of N.Y.*, 261 A.D.2d 34, 38 (1st Dept. 1999).

360.   Defendants' defamation falsely and wrongfully painted Plaintiff DiFonzo as a misogynist who attributed a female captain's success to improper sexual favors, instead of merit, and tended to expose Plaintiff DiFonzo to public contempt, ridicule, aversion, or disgrace, or induced an evil opinion of him in the minds of right-thinking persons, and tended to deprive him of their friendly intercourse in society.

361.   Defendant Ortt-Gawrys used these false statements of fact to damage Plaintiff DiFonzo's career, paint him in a negative light, and as part of her prolonged pattern and intent to demean and vilify him, particularly since she told the office staff "we don't like him."

362.   Defendants provided Defendant Ortt-Gawrys with the means and authority to perpetuate these false statements of fact, failed to investigate them when they learned of them, and otherwise approved of Defendant Ortt-Gawrys' conduct when they knew or should have known that she had a propensity to maliciously target Plaintiff DiFonzo, particularly since Plaintiff DiFonzo, a long-time employee with an unblemished record, repeatedly and specifically told Defendants that Ortt-Gawrys was maliciously targeting him and Plaintiff Rogers. Defendants are liable under the doctrine of respondeat superior, and other common law theories under which an employer is liable for the wrongful actions of its employee.

363.    Defendants are vicariously liable for their employees' intentional acts while in the course and scope of their employment as those acts and Defendant Ortt-Gawrys' conduct were generally foreseeable and a natural consequence of their employment.

364.    Plaintiff DiFonzo is aware that other colleagues have heard these false statements of fact, including the newly-promoted sheriff's captain, and it has strained relationships with some of them.

365.    Plaintiff DiFonzo has suffered damages, both presumed and actual, as a result of Defendants' defamation.

366.    Defendants' malicious defamation evinces that entire want of care which would raise the presumption of conscious indifference to consequences, thus entitling Plaintiffs to punitive damages.

## COUNT III
### Intentional Infliction of Emotional Distress
### By Plaintiffs Against All Defendants

367.    Plaintiffs reallege and incorporate herein by reference each and every allegation contained in ¶¶ 1 through 366 above.

368.    From the end of July 2019 forward, Defendant Ortt-Gawrys, with the approval, knowledge, participation, and grant of authority of Defendants, waged an unrelenting and malicious campaign of harassment directed at Plaintiffs.

369.    Defendant Ortt-Gawrys unlawfully retaliated against Plaintiffs over a two-year period by constantly demeaning Plaintiffs, setting them up for failure, sending employees to spy on them, threatening Plaintiffs with unjustified job termination or adverse employment actions, playing hoaxes on Plaintiffs, campaigning to force them to resign, enlisting the cooperation of their colleagues and supervisees to perpetrate

hoaxes, give unjustified negative reviews, or otherwise isolate them, routinely texting malicious opinions about them to colleagues, threatening to fire or suspend Plaintiffs' colleagues if they were caught talking to or whispering with Plaintiffs, implementing a dangerous punishment for Plaintiff Rogers, lying about Plaintiffs, derailing their careers through baseless accusations and unjustified reviews that were approved by Defendants County of Niagara, Updegrove, NCSO, and Filicetti, inflicting extreme and unnecessary emotional distress, and otherwise engaging in inappropriate conduct at the Forensic Laboratory that imperiled the credibility of the criminal justice system in Niagara County.

370. Defendant Ortt-Gawrys engaged in outrageous abuse, physical endangerment, name-calling, and conduct that was meant to demean or delegitimize Plaintiffs.

371. Defendant Ortt-Gawrys used her political connections to threaten and attempt to silence Plaintiffs.

372. Defendant Ortt-Gawrys routinely texted Plaintiffs' colleagues demeaning and defamatory statements about Plaintiffs that created a toxic and abusive work environment. These text messages caused extreme stress for Plaintiffs and their colleagues, detailed the wrongful acts directed at Plaintiffs, and number more than 2,000.

373. Defendant Ortt-Gawrys subjected Plaintiffs to increased scrutiny over artificial deadlines and unreasonable tasks not assigned to anyone else, despite identical or similar work.

374. Defendant Ortt-Gawrys spread false information and rumors about Plaintiffs.

375. Defendant Ortt-Gawrys opened Plaintiff DiFonzo's private mail, broadcasted his

Plaintiff DiFonzo's salary and overtime hours to the administrative staff and his supervisees, opened what she knew to be his concealed carry permit, and speculated to the office staff that he must be getting ready to leave his career since he applied for it; all of these actions were highly offensive and objectionable to him.

376.   For two years, Defendants made their work more difficult, harassed Plaintiffs, derailed their careers, and created a stressful and abusive work atmosphere. These examples were just a few of the actions carried out on a daily basis against Plaintiffs.

377.   Defendants are liable for their employees' intentional acts while in the course and scope of their employment since those acts, and Defendant Ortt-Gawrys' conduct, were a generally foreseeable and a natural consequence of her employment. Defendant Ortt-Gawrys' was given the authority to direct the Sheriff's Forensic Laboratory, and to supervise Plaintiffs, even though she lacked competence as a manager and was abusive, and, as her malicious abuse escalated and despite notice, Defendants failed to retrain, supervise, or otherwise restrain her from inflicting additional abuse on Plaintiffs.

378.   Moreover, Defendants took part in the commission of those wrongful acts by approving, authorizing, suggesting, ordering, and otherwise condoning those acts, as detailed throughout this Complaint, and are therefore liable under the theory of respondeat superior.

379.   Defendants dismissed Plaintiffs' opinions, ignored their requests for help, questioned their abilities and integrity, and violated their right to privacy by discussing these matters with others in and outside the Sheriff's Forensic Laboratory, threatened them with dismissal or suspension, and otherwise fostered an intolerable work atmosphere.

380.    Defendants abused their power by repeatedly threatening Plaintiff DiFonzo with job suspension and job loss for providing notice that Defendant Ortt-Gawrys was retaliating against him and Plaintiff Rogers.

381.    All of the actions detailed above were highly offensive and objectionable to Plaintiffs.

382.    Moreover, Plaintiff DiFonzo had to endure the targeting and harassment of his daughter, Plaintiff Rogers, and watch as her career was destroyed, her physical health was jeopardized by banishing her to a toxic environment, and her emotional and mental health was impacted.

383.    This pattern of nearly constant harassment over more than two years is illegal and wrongful.

384.    Plaintiffs and their families have experienced extreme physical and emotional stress and anxiety as a result of the retaliation and abuse described above. Plaintiff DiFonzo has had to seek emergency medical treatment related to the stress of Defendants' conduct. Plaintiff DiFonzo has not only lived with the constant uncertainty of what would happen next with his life-long career, but he had to witness the vile treatment of his daughter by Defendants as a result of Defendants' retaliation against him. Their distress has greatly affected their entire family, which has caused even more stress for Plaintiffs.

385.    Plaintiff Rogers has been unable to return to work in her chosen field. She is dealing with trauma under the care of a professional as a result of Defendants' abuse and harassment.

386.    Neither Plaintiff wanted to leave their career, but both had been driven to the point

where no reasonable person could withstand the abuse.

387.    Defendants' conduct in targeting, demeaning, harassing, demoting, punishing, discrediting, isolating, tricking, assaulting, threatening, humiliating, and defaming Plaintiffs, and otherwise destroying their careers, is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

388.    By targeting, demeaning, harassing, demoting, punishing, discrediting, isolating, tricking, assaulting, threatening, humiliating, and defaming Plaintiffs, and otherwise destroying their careers, Defendants intended to cause, or disregarded the substantial probability of causing, severe emotional distress.

389.    Plaintiffs have suffered emotional, financial, physical, and actual damages as a direct result of Defendants' intentional infliction of emotional distress.

390.    There is a causal connection between Defendants' conduct in targeting, demeaning, harassing, demoting, punishing, discrediting, isolating, tricking, assaulting, threatening, humiliating, and defaming Plaintiffs, and otherwise destroying their careers, and their injuries.

391.    The actions that constitute intentional infliction of emotional distress evince that entire want of care which would raise the presumption of conscious indifference to consequences, thus entitling Plaintiffs to punitive damages.

**COUNT IV**

**Negligent Retention and Supervision Against Defendants County of Niagara, Updegrove, NCSO, and Filicetti**

392.    Plaintiffs reallege and incorporate herein by reference each and every allegation

contained in ¶¶ 1 through 391 above.

393.    Defendant Ortt-Gawrys intentionally inflicted emotional distress upon Plaintiffs, violated their privacy, played hoaxes on them, set them up for failure, embarrassed them, demeaned them, and otherwise unlawfully harassed and abused them by engaging in a two-year period of near-constant harassment and abuse.

394.    Defendant Ortt-Gawrys' conduct constitutes actionable torts under New York State law.

395.    The torts of intentional infliction of emotional distress and defamation are predicate torts by Defendant Ortt-Gawrys that will support a claim of negligent retention and supervision against County of Niagara, Updegrove, NCSO, and Filicetti under New York law.

396.    Defendants County of Niagara, Updegrove, NCSO, Filicetti and Defendant Ortt-Gawrys were in an employer-employee relationship since May 2017, when Defendants hired Defendant Ortt-Gawrys to run the Niagara County Sheriff's Forensic Laboratory.

397.    Defendants County of Niagara, Updegrove, NSCO, and Filicetti had a duty and the responsibility to properly train and supervise Defendant Ortt-Gawrys.

398.    Defendants County of Niagara, Updegrove, NCSO, and Filicetti failed to properly supervise or train Defendant Ortt-Gawrys, and otherwise negligently retained and supervised Defendant Ortt-Gawrys.

399.    Defendant Ortt-Gawrys, as the director of the Niagara County Sheriff's Forensic Laboratory, supervised Plaintiffs.

400.    Defendant Ortt-Gawrys lacked competence, was abusive, unprofessional, and was

otherwise unfit for the highest supervisory role in the Niagara County Sheriff's Forensic Laboratory. She unlawfully retaliated against Plaintiffs by demoting or refusing to promote them, demeaned them, delegitimized their authority, and by setting them up for failure, sending employees to spy on them, threatening Plaintiffs with job termination or adverse employment actions, playing hoaxes on Plaintiffs, campaigning to force them to resign, enlisting the cooperation of their colleagues and supervisees to perpetrate hoaxes, give unjustified negative reviews, or otherwise lying about Plaintiffs, derailing their careers through baseless accusations and unjustified reviews that were approved by Defendants County of Niagara, Updegrove, NCSO, and Filicetti, inflicted extreme and unnecessary emotional distress, and otherwise engaging in inappropriate conduct at the Sheriff's Forensic Laboratory that imperiled the credibility of the criminal justice system in Niagara County.

401.   Defendant Ortt-Gawrys' wrongful conduct persisted for a two-year period.

402.   Defendants County of Niagara, Updegrove, NCSO, and Filicetti, knew or should have known of Defendant Ortt-Gawrys' propensity for the ongoing conduct that caused Plaintiffs' injury because:

    a.   In the Fall of 2019, Defendants learned of significant turmoil in the Forensic Laboratory involving Defendant Ortt-Gawrys and Plaintiff DiFonzo, an employee that, in twenty-five years of excellent service, had never been involved in any type of complaint or misconduct whatsoever;

    b.   In March of 2020, Plaintiff DiFonzo specifically reported to Defendants that Defendant Ortt-Gawrys was retaliating against Plaintiffs because Plaintiff DiFonzo, at the end of July and early August 2019, expressed concerns about

ethics and public health and safety issues and that her anger and conduct towards him began after that incident; Plaintiff DiFonzo's concerns were summarily and unjustifiably dismissed by Defendants at that time and thereafter;

c. During the March 2020 meeting, Plaintiff DiFonzo provided specific examples about the manner in which Defendant Ortt-Gawrys was targeting him, harassing him, treating him differently than other employees, demeaning him, playing hoaxes on him, lying about him, defaming him, and setting him up for failure, all in retaliation for expressing his concerns at the end of July and early August 2019 about ethics and public health and safety issues; his concerns were summarily and unjustifiably dismissed;

d. During the March 2020 meeting, Plaintiff DiFonzo specifically reported to Defendants County of Niagara, Updegrove, NCSO, and Filicetti that Defendant Ortt-Gawrys was targeting his daughter, Plaintiff Rogers, in retaliation for Plaintiff DiFonzo speaking up about unethical choices that would have an impact on public health and safety and the integrity of the law enforcement system, but his concerns were summarily dismissed;

e. The complaints raised by Plaintiff DiFonzo during the March 2020 meeting were of sufficient seriousness - and implicated the integrity of the Forensic Laboratory - that it should have triggered an immediate and thorough investigation by Defendants, including interviews with the Sheriff's Forensic Laboratory staff, including Ms. K., Brandon, and Ms. S, particularly since two employees had already left the department under Defendant Ortt-Gawrys' leadership, which is a serious red-flag in a forensic laboratory;

f.  Defendants were able to directly observe Defendant Ortt-Gawrys' conduct, including the windows she had covered, because the wrongful and illegal actions were committed on the Defendants' premises, in Defendants' laboratory, which was down the hall and in the same building as Defendants NCSO and Filicetti, and all Defendants have the right and duty to inspect or visit the Sheriff's Forensic Laboratory at any time they wish;

g.  Defendants were aware of Defendant Ortt-Gawrys' out of bounds conduct because they expressly signed off on Ortt-Gawrys' wrongful behavior, and reinforced, condoned, and approved it by affirming her inappropriate reviews of Plaintiffs, counseling letters, and punishments, as well as her refusal to schedule the Plaintiffs during the same shift to prevent the spread of COVID within the same family, despite the fact that Defendant Ortt-Gawrys contravened Defendants' instructions by scheduling them separately;

h.  Six months later, on September 3, 2020, Plaintiff DiFonzo again provided express notice to Defendants that Defendant Ortt-Gawrys was targeting him for speaking up about unethical conduct in the Sheriff's Forensics Laboratory, which Defendants again chose to ignore; indeed, Defendants threatened Plaintiff DiFonzo with job termination or a forced leave if he brought it up again;

i.  In the September 3, 2020, Defendant Ortt-Gawrys admitted that her counseling memo about Plaintiff DiFonzo not attending training was untrue, yet Defendants still did not investigate or follow up on Plaintiff DiFonzo's concerns or discipline Defendant Ortt-Gawrys for lying.

j.  In the September 3, 2020 meeting, Plaintiff DiFonzo attempted to address the

continuing harassment, unequal treatment, and malicious conduct directed towards him and Plaintiff Rogers, and the fact that it stemmed from him speaking up in 2019, when he expressed grave concerns about Ms. K being certified when she was not ready. Defendants improperly and unjustifiably ignored Plaintiff DiFonzo's serious concerns, which again should have tipped them off that Defendant Ortt-Gawrys lacked competence to lead the Forensic Laboratory or supervise Plaintiffs.

403. Defendants' failure to fully and appropriately investigate Plaintiff DiFonzo's concerns about Defendant Ortt-Gawrys were egregious, particularly since they implicated unethical conduct at a forensic evidence laboratory, which has to be beyond reproach, and they were coming from a long-time, trusted law enforcement employee with a stellar employment record.

404. By ignoring these concerns, approving outrageous punishments and improper deadlines, facilitating an unjustified demotion, refusing to promote Plaintiff Rogers, failing to interview other laboratory employees who would have backed up Plaintiffs' concerns, and refusing to investigate Defendant Ortt-Gawrys, Defendants County of Niagara, Updegrove, NCSO, and Filicetti failed to properly train, supervise, instruct, and manage Defendant Ortt-Gawrys so that she would properly supervise Plaintiffs.

405. Defendant Ortt-Gawrys' improper and wrongful conduct continued unabated until Fall 2021, when she was finally placed on administrative leave and resigned, but after Plaintiffs had already been forced to resign.

406. By then Plaintiffs had endured two years of targeted and illegal conduct that resulted in them being forced to resign from their highly desired positions.

407.   Defendant County of Niagara, Updegrove, NCSO, and Filicetti could have prevented further harm and harassment to Plaintiffs by properly investigating or taking action during the Fall of 2019, when they already knew the situation involving their supervisor's poor management was escalating, or by March 2020, when serious allegations of impropriety and wrongdoing were explicitly raised by Plaintiff DiFonzo about Defendant Ortt-Gawrys and her retaliatory conduct.

408.   Defendants County of Niagara, Updegrove, NCSO, and Filicetti failed to properly train, supervise, instruct and manage Defendant Ortt-Gawrys even when they knew of numerous facts that would lead a reasonably prudent person or employer to investigate their supervisor, Defendant Ortt-Gawrys.

409.   Plaintiffs have suffered financial, emotional, reputational, and other damages as a result of Defendants' failure to properly train, monitor, investigate, control, or supervise Defendant Ortt-Gawrys, and for their failure to terminate her employment or place her on administrative leave until Fall 2021.

410.   Plaintiffs have suffered damages, and those injuries were caused solely and wholly by reason of the negligence and carelessness of Defendants in the operation, management, training, maintenance, control, security and supervision of Defendant Ortt-Gawrys.

411.   The lack of exercise of ordinary care in the retention, supervision and/or training of Defendants' employee evinces that entire want of care which would raise the presumption of conscious indifference to consequences, thus entitling Plaintiffs to punitive damages.

**PRAYER FOR RELIEF**

**WHEREFORE,** these Plaintiffs respectfully pray the Court, to**:**

(1)    Declare that Defendants violated Plaintiffs' First Amendment Rights to freedom of speech;

(2)    Grant both of the Plaintiffs compensatory damages for the violation of Plaintiffs' First Amendment rights in an amount to be determined by the trier of fact;

(3)    Grant both of the Plaintiffs compensatory and special damages for defamation in an amount to be determined by the trier of fact;

(4)    Grant both of the Plaintiffs compensatory and special damages for Intentional Infliction of Emotional Distress in an amount to be determined by the trier of fact;

(5)    Grant both of the Plaintiffs compensatory and special damages for negligent retention and supervision;

(6)    Grant Plaintiffs their costs of this action, including litigation expenses, out–of–pocket expenses and reasonable attorneys' fees, in accordance with all applicable provisions of law;

(7)    Grant punitive damages against all Defendants in an amount to be determined by the trier of fact; and

(8)     Grant Plaintiffs such other relief as may be just and equitable.

Respectfully submitted,

_____
Christen E. Civiletto, Esq.
8313 West Point Drive
East Amherst, New York
14051
(716) 713-2431
christenciviletto@gmail.com




_____
Joseph A. Ruta, Esq.
Ruta Soulios & Stratis LLP
401 Park Avenue South, 10th Floor,
New York, NY 10016
(212) 997-4500
jruta@lawnynj.com
*admission application to be filed*


**_____**


*COUNSEL FOR PLAINTIFFS*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 28, 2022, I filed the foregoing pleading and all supporting documents electronically with the United States District Court for the Western District of New York through the CM/ECF system, and that a copy is being served on counsel of record via email at mhickey@bsk.com.

Christen E. Civiletto, Esq.