UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

THOMAS J. DIFONZO and LAUREN ROGERS,     )
)
)
    Plaintiffs,     )
)
    v.     )     Case No. 1:22-cv-588
)
COUNTY OF NIAGARA, RICHARD E. UPDEGROVE, NIAGARA COUNTY SHERIFF'S OFFICE, MICHAEL J. FILICETTI, and DR. KORI ORTT GAWRYS,     )
)
)
)
)
)
)
    Defendants.     )

**OPINION AND ORDER ON MOTIONS TO DISMISS**
**(Docs. 15, 27)**

Plaintiffs Thomas DiFonzo and Lauren Rogers, Mr. DiFonzo's daughter—both former employees at the Niagara County Forensic Laboratory—allege that they experienced harassment in retaliation for Mr. DiFonzo's refusal to certify a drug chemist-in-training and Mr. DiFonzo's statements to the lab director that certifying the other employee would be unethical and illegal and could have numerous negative repercussions. Defendants move to dismiss the Amended Complaint for failure to state a claim. For the reasons that follow, the court concludes that Plaintiffs' only federal-law cause of action, their First Amendment retaliation claim, fails as a matter of law because Mr. DiFonzo made the statements at issue in his capacity as an employee, not as a citizen speaking on a matter of public concern. *Ross v. Breslin*, 693 F.3d 300, 305 (2d Cir. 2012). Therefore, the court grants Defendants' motion to dismiss the sole federal-law claim and declines to exercise supplemental jurisdiction over the remaining state-law claims.

## Factual Background[1]

Mr. DiFonzo and Ms. Rogers have brought a four-count complaint against the County of Niagara, Richard Updegrove (the County Manager), the Niagara County Sheriff's Department, Michael Filicetti (the elected Sheriff of Niagara County), the Niagara County Forensic Laboratory ("the Lab"), and Dr. Kori Ortt-Gawrys (the Lab's Director). (Doc. 16 ¶¶ 4–9.)

Defendant Dr. Ortt-Gawrys acted as the Director of the Lab starting in May 2017. (*Id.* ¶ 32.) She was not certified to handle drug or firearm analysis. Instead, she conducted DNA analysis and serology tests. (*Id.* ¶ 38.) She reported to Sheriff Deputy Chief Weidel, who reported to Undersheriff Michael Dunn, who reported to Defendant Sheriff Mr. Filicetti. (*Id.* ¶¶ 33–36.) The Niagara County Sheriff's Office follows strict chain of command procedures for reporting employee and work issues. (*Id.* ¶ 37.)

Mr. DiFonzo and Ms. Rogers both worked in the Lab. (*Id.* ¶¶ 2–3.) Ms. Rogers worked as a civilian firearms expert in the Lab starting in 2017. She was also qualified in drug chemistry. (*Id.* ¶¶ 28–29.) She had an exemplary employment record. (*Id.* ¶ 30.)

Mr. DiFonzo worked in the Lab starting in 1997 and had an exemplary employment record. (*Id.* ¶¶ 17–21.) Between April 2017 and March 2020, he was the Assistant Laboratory Director. (*Id.* ¶¶ 22, 26.) He also continued his work as a forensic drug chemist during his time as Assistant Director. (*Id.* ¶ 23.) His responsibilities in those two roles included receiving, storing, analyzing, and eventually destroying evidence; maintaining and calibrating equipment; testifying in court; supervising the drug chemistry department; supervising the other employees in the lab; and handling overtime requests, timecards, employee vacation requests, and

---

[1] The court draws all factual allegations from Plaintiffs' Amended Complaint, which they filed as a matter of course under Federal Rule of Civil Procedure 15(a)(1)(B). (Doc. 16.)

scheduling. (*Id.* ¶¶ 23–24, 26.) Mr. DiFonzo supervised Ms. Rogers, one other chemist, and

"Ms. K," who was a toxicologist, but Mr. DiFonzo supervised her to the extent she performed

drug chemistry duties. (*Id.* ¶ 24.) The Lab's policy was to have 10% of the drug chemistry cases

reviewed either by Mr. DiFonzo or Ms. Rogers or by a non-certified drug chemist. (*Id.* ¶ 25.)

There is extensive training involved in becoming a forensic drug chemist. (*See id.* ¶¶ 39–

56.) A drug chemist-in-training must work under a supervising drug chemist and keep track of all

training in a binder called a "controlled substances training binder." (*Id.* ¶¶ 43–45.) The state

accreditation board may review this binder during the Lab's accreditation process. (*Id.* ¶ 50.)

The drug chemist-in-training may not independently perform any forensic drug analysis until a

supervisor, certified in the industry, approves and signs the binder. (*Id.* ¶¶ 51–52.) In addition,

the drug chemist-in-training must pass both an oral and written proficiency exam. (*Id.* ¶ 53.)

Another employee of the Lab, Ms. K, worked as a toxicologist. (*Id.* ¶¶ 24, 58.) As of

July 2019, Ms. K had not yet been certified in drug chemistry and neither Mr. DiFonzo nor

Ms. Rogers had trained her. (*Id.* ¶¶ 59–60.) But at the end of July 2019, Dr. Ortt-Gawrys directed

Mr. DiFonzo to approve Ms. K for drug chemistry analysis and to sign off on her training binder.

(*Id.* ¶ 61.) Mr. DiFonzo refused because "it would be unethical to approve her when neither

[Mr. DiFonzo] nor anyone else had trained her and she was not ready." (*Id.* ¶ 62.) Even Ms. K

recognized that she was not yet ready. (*Id.* ¶ 68.) Instead, Mr. DiFonzo offered to train Ms. K,

but Dr. Ortt-Gawrys instructed Mr. DiFonzo to sign her binder and approve her anyway.

(*Id.* ¶¶ 69–70.) He again refused, causing Dr. Ortt-Gawrys to become agitated and announce that

she would approve Ms. K herself. (*Id.* ¶¶ 71–73.) But, at that time, Mr. DiFonzo was the only

certified drug chemist in the lab who could sign off on Ms. K's binder. (*Id.* ¶ 75.)

Then, while Mr. DiFonzo was away on vacation in August 2019, Dr. Ortt-Gawrys directed Ms. K to take the proficiency exam, which she passed, and then signed her controlled substances binder even though she lacked the proper authority. (*Id.* ¶¶ 76–77.) Ms. K expressed concern because she worried that her under-developed binder could cause accreditation issues for the Lab in the future and because she was not yet prepared to do the work required of the position.[2] (*Id.* ¶¶ 78, 85.) When Mr. DiFonzo returned from vacation, he was alarmed and expressed his concern to Dr. Ortt-Gawrys "that her decision to approve Ms. K . . . was unethical, illegal, wrong, and could have serious consequences for the prosecution of drug cases in Niagara County" and because he "regarded the improper certification as a threat to public health and safety." (*Id.* ¶¶ 79–82.) Dr. Ortt-Gawrys responded with "excessive anger" and "berated" Mr. DiFonzo in front of the other Lab employees. (*Id.* ¶¶ 83–84.)

After Mr. DiFonzo confronted Dr. Ortt-Gawrys about her approval of Ms. K as a drug chemist, Dr. Ortt-Gawrys, "with the means and authority given to her by Defendants, began a malicious and sustained campaign to harass and target" both Mr. DiFonzo and Ms. Rogers over the course of the next two years. (*Id.* ¶¶ 95–97, 99.) The other defendants enabled this conduct by refusing to investigate it. (*Id.* ¶ 98.) For example, Dr. Ortt-Gawrys sent employees to spy on Mr. DiFonzo and Ms. Rogers in an attempt to find them doing something wrong, gave artificial and unreasonable deadlines for work, purposely gave conflicting instructions, held them to higher standards than other employees, assigned extra work, texted other employees that Mr. DiFonzo and Ms. Rogers wanted the other employees to be fired, publicly yelled at

---

[2] Mr. DiFonzo alleged that in the year after Dr. Ortt-Gawrys signed off on Ms. K as a drug chemist, Ms. K refused to analyze anything other than marijuana and pills because she did not feel she had adequate training, continued to ask Mr. DiFonzo and Ms. Rogers numerous questions, did not know how to use certain equipment, and, once she began analyzing powders, made a mistake that Mr. DiFonzo caught during his review. (Doc. 16 ¶¶ 85–90.)

Mr. DiFonzo and Ms. Rogers, and referred to Mr. DiFonzo as "the asshole" and Ms. Rogers as "the entitled little bitch." (*Id.* ¶¶ 100–111, 129–137.) Mr. DiFonzo and Ms. Rogers offer other examples of retaliation as well. (*See, e.g.*, *id.* ¶¶ 189–194.) Moreover, to intimidate Mr. DiFonzo and Ms. Rogers, Dr. Ortt-Gawrys repeatedly informed the Lab employees that her brother was a New York state senator such that she was "untouchable." (*Id.* ¶ 130.)

At Deputy Chief Weidel's request, Mr. DiFonzo met with the deputy chief in March 2020. (*Id.* ¶ 142.) At that meeting, Deputy Chief Weidel explained that he was aware of the problems between Mr. DiFonzo and Dr. Ortt-Gawrys; Mr. DiFonzo explained that the problem began when he refused to sign off on Ms. K's certification in July 2019 and his subsequent confrontation with Dr. Ortt-Gawrys in August 2019 after she signed Ms. K's binder while Mr. DiFonzo was on vacation. (*Id.* ¶¶ 145–149, 155.) Deputy Chief Weidel dismissed Mr. DiFonzo's concerns as a difference of opinion and instructed Mr. DiFonzo to try to get along with Dr. Ortt-Gawrys. (*Id.* ¶¶ 150–152.) Mr. DiFonzo protested and explained that Dr. Ortt-Gawrys was his supervisor, not a coworker, and that the harassment was constant, he also asked the deputy chief for help. (*Id.* ¶¶ 153–159.) But Deputy Chief Weidel instructed Mr. DiFonzo to try to work with Dr. Ortt-Gawrys. (*Id.* ¶¶ 160–62.)

After this March 2020 meeting, Dr. Ortt-Gawrys continued her harassment. (*Id.* ¶ 163.) Two weeks later, Defendants demoted Mr. DiFonzo and restricted his access to certain information, instead allowing Ms. K to approve Mr. DiFonzo's requested time off, briefing time, and pay. (*Id.* ¶¶ 164–168, 171.)

Ms. Rogers, too, experienced harassment. (*Id.* ¶ 174.) Despite her extensive training and qualifications, Dr. Ortt-Gawrys refused to promote Ms. Rogers to the position of "Criminalist II" or "Firearms II." (*Id.* ¶¶ 175–83.) Dr. Ortt-Gawrys refused to promote her "because 'she didn't

want to'" and gave several other "nonsensical" reasons for her refusal. (*Id.* ¶¶ 184–185.) At one point, Dr. Ortt-Gawrys created a fake advertisement for the position of Firearms II and when an employee found it in the printer and brought it to her, Dr. Ortt-Gawrys instructed the employee to leave it in the printer so that Ms. Rogers would find it and know she would never receive the promotion. (*Id.* ¶¶ 186–187.)

In fall 2020, Dr. Ortt-Gawrys gave Mr. DiFonzo a negative performance review for being insubordinate when he failed to attend a class. (*Id.* ¶ 197.) On September 3, 2020, after that review, Mr. DiFonzo again had a meeting with Deputy Chief Weidel, Dr. Ortt-Gawrys, and a union representative. (*Id.* ¶¶ 197, 199.) Deputy Chief Weidel reprimanded Mr. DiFonzo for failing to get along with Dr. Ortt-Gawrys, but Mr. DiFonzo asserted that the negative performance review was a pretext and that Dr. Ortt-Gawrys had lied about his failure to attend the class, which Dr. Ortt-Gawrys admitted. (*Id.* ¶¶ 197, 200–201.) Mr. DiFonzo again informed the deputy chief that Dr. Ortt-Gawrys's behavior all started after the events surround Ms. K's certification in July and August 2019, but Defendants "immediately and forcibly shut [him] down" and "warned [him] that his career was on the line" with the next step being a leave of absence or possible termination. (*Id.* ¶¶ 202–207.)

After this meeting, Dr. Ortt-Gawrys continued to harass Mr. DiFonzo and Ms. Rogers in a variety of ways. (*See id.* ¶¶ 208–218.) In addition, in May 2021 Dr. Ortt-Gawrys requested that certain officers' drug cases be given priority and began receiving evidence directly from certain officers in her office. (*Id.* ¶¶ 220–221.) Mr. DiFonzo again expressed concern, but Dr. Ortt-Gawrys covered her office windows so nobody could see inside. (*Id.* ¶¶ 221–223.) Dr. Ortt-Gawrys was again angered by Mr. DiFonzo's concern and, in June 2021 while he was out of the

office, gave Ms. Rogers a negative performance review. (*Id.* ¶¶ 224–225.) Plaintiffs allege that this negative performance review was also pretext. (*Id.* ¶¶ 226–229.)

Because of the negative performance review, Ms. Rogers had a meeting with Dr. Ortt-Gawrys. (*Id.* ¶ 230.) Ms. Rogers attempted to reason with Dr. Ortt-Gawrys, but Dr. Ortt-Gawrys specifically mentioned Mr. DiFonzo's concerns about approving Ms. K as a drug chemist in July and August 2019. (*Id.* ¶¶ 230–31.) As a result of the meeting, Dr. Ortt-Gawrys recommended discipline for Ms. Rogers in the form of moving her desk into the isolated firearms room where firearms are discharged for testing purposes. (*Id.* ¶¶ 232–233.) This was Deputy Chief Weidel's idea after also reviewing Ms. Rogers' negative performance review, but Dr. Ortt-Gawrys instituted the disciplinary measure. (*Id.* ¶¶ 234–236.) Ms. Rogers's desk was moved into the firearms room, placing her in danger. (*Id.* ¶¶ 243–246.) When Ms. Rogers inquired with the Lab in Erie County to see if any of their employees had ever been disciplined in this manner, the Erie County employees were appalled at her treatment. (*Id.* ¶¶ 247–248.) Ms. Rogers, however, did not speak up further and requested that Mr. DiFonzo not do so either for fear of further retaliation, which was compounded by Dr. Ortt-Gawrys's continued reference to her brother's position as state senator. (*Id.* ¶¶ 249–253.) After this, harassment continued. (*Id.* ¶¶ 254–256.)

Separately, though also in June 2021, after a female Sheriff's deputy was promoted to captain, Dr. Ortt-Gawrys told the Lab staff that Mr. DiFonzo had said this deputy was promoted only because she provided sexual favors to members of the administration. (*Id.* ¶¶ 116, 258.) Dr. Ortt-Gawrys also told Mr. DiFonzo's colleagues that he hated working for women and opposed their hiring. (*Id.* ¶¶ 112–113, 259.) Mr. DiFonzo asserts that both statements were false. (*Id.* ¶ 260.) The newly promoted female captain confronted Mr. DiFonzo about his statement, and he told her that the statement was false. (*Id.* ¶ 261.)

Mr. DiFonzo and Ms. Rogers allege that all Defendants knew of the harassment taking place at the Lab based on Mr. DiFonzo's reports during the meetings in March 2020 and September 2021, but that Defendants refused to act or intervene. (*Id.* ¶¶ 264–277, 292–294.) Ultimately, Ms. Rogers felt she had no choice but to resign, which she did in August 2021. (*Id.* ¶¶ 278–279.) After she resigned, Dr. Ortt-Gawrys told other employees "one down, one to go." (*Id.* ¶ 281.) Mr. DiFonzo, too, was forced to resign in September 2021. (*Id.* ¶¶ 294–295.) Before he resigned, Defendants requested that Mr. DiFonzo sign off on Ms. K's binder and back-date that signature, but he refused. (*Id.* ¶¶ 310–315.) In November 2021, Dr. Ortt-Gawrys was placed on administrative leave and eventually resigned. (*Id.* ¶ 308.)

As a result of Defendants' actions, Mr. DiFonzo and Ms. Rogers both allege that they suffered severe emotional distress, including anxiety, loss of confidence, sleep disorders, and stress-induced physical effects. (*Id.* ¶¶ 286–287, 289–291, 298–300, 304–305.) Mr. DiFonzo also alleges that he lost salary and pension benefits. (*Id.* ¶ 306.) In addition, Mr. DiFonzo alleges that he continues to suffer the stigma of Dr. Ortt-Gawrys's false statements about his attitude towards women. (*Id.* ¶¶ 302–303.)

Based on these allegations, Mr. DiFonzo and Ms. Rogers have brought a four-count complaint against the defendants. After Mr. DiFonzo and Ms. Rogers filed their first complaint, Dr. Ortt-Gawrys filed a motion to dismiss. (Doc. 15.) Plaintiffs then filed their Amended Complaint as a matter of course. (Doc. 16.) Dr. Ortt-Gawrys filed a supplemental memorandum of law to address the Amended Complaint. (Doc. 22.) Mr. DiFonzo and Ms. Rogers opposed the motion (Doc. 24) and Dr. Ortt-Gawrys replied (Doc. 29).

Separately, the other defendants also filed a motion to dismiss (Doc. 27.). Mr. DiFonzo and Ms. Rogers also opposed it (Doc. 33) and the other defendants replied (Doc. 36).

The court elects to rule on both motions to dismiss together because they both relate to the same factual allegations and the same legal claims.

## Legal Standard

In ruling on a motion to dismiss, the court accepts as true the allegations of the complaint and draws all reasonable inferences in favor of the non-moving party. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009); *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011). The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also* Fed. R. Civ. P. 8(a)(2). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson*, 631 F.3d at 63 (quoting *Iqbal*, 556 U.S. at 678). Dismissal is appropriate when "it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law." *Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 86 (2d Cir. 2000).

## Analysis

Plaintiffs' Amended Complaint has four different causes of action. In Count I, both Mr. DiFonzo and Ms. Rogers bring a First Amendment retaliation claim under 42 U.S.C. § 1983 based on the retaliation Mr. DiFonzo and Ms. Rogers allegedly suffered because of Mr. DiFonzo's expressed concerns about signing off on Ms. K's binder. (*See id.* ¶¶ 316–354.) In Count II, Mr. DiFonzo brings a state-law defamation claim against all Defendants based on Dr. Ortt-Gawrys's alleged false statements attributed to Mr. DiFonzo. (*See id.* ¶¶ 355–367.) In Count III, both Mr. DiFonzo and Ms. Rogers bring a state-law claim for intentional infliction of emotional distress (IIED) against all Defendants based on the alleged harassment at the Lab.

(*Id.* ¶¶ 368–392.) In Count IV, Mr. DiFonzo and Ms. Rogers bring a state-law claim for

negligent retention and supervision, predicated on their IIED claim, against Niagara County,

County Manager Richard Updegrove, the Niagara County Sheriff's Office, and elected Niagara

County Sheriff Michael Filicetti. (*See id.* ¶¶ 393–412.)

The court begins with the sole federal-law claim before turning to the state-law claims.

## I.    Count I: First Amendment Retaliation

Mr. DiFonzo and Ms. Rogers brought a claim under 42 U.S.C. § 1983 for First

Amendment retaliation based on Mr. DiFonzo's comments related to Ms. K's certification in

July and August 2019 and the alleged retaliation they suffered thereafter.[3] (Doc. 16 ¶¶ 317–320,

321, 325.) Defendants move to dismiss this claim, arguing that the First Amendment did not

protect Mr. DiFonzo's speech. (Doc. 15-1 at 4–9; Doc. 22 at 2; Doc. 27-1 at 5–11.)

Section 1983 provides a private cause of action for individuals to sue a "person who,

under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or

causes to be subjected, any citizen of the United States. . . to the deprivation of any rights,

privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983;

*Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Suits under § 1983 distinguish between claims

brought against a defendant in his or her individual versus official capacity. *See, e.g.*,

*Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Tanvir v. Tanzin*, 894 F.3d 449, 458–59 (2d Cir. 2018).

Because the court resolves Mr. DiFonzo's and Ms. Rogers' claim as a matter of law regardless of

Defendants' capacities, the court will not address the capacity in which Plaintiffs sued

Defendants. Instead, the court moves directly to the merits of the claim.

---

[3] Because the court concludes that Mr. DiFonzo's comments were unprotected speech, it
does not reach or address the parties' arguments on the issue of whether Ms. Rogers could raise a
third-party First Amendment retaliation claim based on Mr. DiFonzo's speech.

"To make out a "prima facie case of First Amendment retaliation, a plaintiff must establish (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Shara v. Maine-Endwell Cent. Sch. Dist.*, 46 F.4th 77, 82 (2d Cir. 2022) (quoting *Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003)). Here, the court begins and ends its analysis with the first element.

There is no debate that public employees enjoy First Amendment protections for speech while at work. *See, e.g.*, *Connick v. Myers*, 461 U.S. 138, 142 (1983); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). But that protection is not absolute. Instead, a public employee's speech "is protected by the First Amendment only when the employee is speaking 'as a citizen . . . on a matter of public concern.'" *Ross*, 693 F.3d at 305 (quoting *Piscottano v. Murphy*, 511 F.3d 247, 269–70 (2d Cir. 2007)). That means that an employee is not protected from employer discipline when he "make[s] statements pursuant to [his] official duties" because the employee "is not speaking as [a] citizen[] for First Amendment purposes." *Id.* (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)). This remains true "even when the subject of an employee's speech is a matter of public concern. *Id.* Therefore, even if Mr. DiFonzo's comments were on a matter of public concern, the court must grant Defendants' motion to dismiss Mr. DiFonzo's First Amendment retaliation claim if he was speaking as an employee and not as a citizen.

There is no bright-line rule to determine when an employee was speaking pursuant to his official employment duties versus when an employee was speaking as a citizen. *Ross*, 693 F.3d at 306. Instead, courts "must examine the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two." *Id.* This inquiry is "a practical one."

*Weintraub v. Bd. of Educ.*, 593 F.3d 196, 202 (2d Cir. 2010) (quoting *Garcetti*, 547 U.S. at 424).

It focuses on whether the speech was "part-and-parcel of [an employee's] concern about his

ability to properly execute his duties." *Id.* at 203. A court may also consider whether the

employee's complaint to his employer has a "civilian analogue," *Shara*, 46 F.4th at 83, and

whether the speech "was also conveyed to the public," *Ross*, 693 F.3d at 306; *accord Weintraub*,

593 F.3d at 203–04.

### A.    The Practical Inquiry as Applied in Recent Cases

A few recent cases demonstrate how courts have resolved this legal issue when faced

with analogous facts. In *Garcetti*, a deputy district attorney discovered misrepresentations in an

affidavit affixed to a search warrant application and, in a memorandum to his superiors, noted

the error and recommended that the charges against that defendant be dismissed. 547 U.S.

at 413–15. He alleged that retaliation followed that action. *Id.* at 415. The Supreme Court held

that the attorney was not speaking as a citizen at the time because "his expressions were made

pursuant to his duties as a calendar deputy" and he "fulfill[ed] a responsibility to advise his

supervisor about how best to proceed with a pending case." *Id.* at 421. In other words, the memo

was part-and-parcel of his employment duties and, therefore, not protected speech.

In *Lane v. Franks*, the Supreme Court considered the case of a state program director

who alleged he was demoted because of his testimony to a grand jury about his department's

payroll. 573 U.S. 228, 231–35 (2014). The Supreme Court held that the employee's testimony

was protected citizen speech because "any such obligations as an employee [to testify] are

distinct and independent from the obligation, as a citizen, to speak the truth." *Id.* at 239.

The Supreme Court also clarified that *Garcetti* does not stand for the broad proposition that

speech is automatically unprotected employee speech because the speaker learned of the speech's subject matter through or during his employment. *Id.*

The Second Circuit, too, has had occasion to address numerous cases of alleged First Amendment retaliation against a public employee and whether the relevant speech was unprotected employee speech or protected citizen speech. In *Weintraub*, for example, the Second Circuit addressed the scenario of a teacher's union grievance after school administrators failed to discipline a student in the teacher's class. 593 F.3d at 198–99. The teacher alleged he experienced retaliation after he filed the grievance. *Id.* at 199. The Second Circuit rejected the argument that the teacher's union grievance was not part of his official duties, holding that "speech can be 'pursuant to' a public employee's official job duties even though it is not required by, or included in, the employee's job description, or in response to a request by the employer." *Id.* at 203. Moreover, the court explained that a private citizen could not have made the union grievance. *Id.* at 203–04. Therefore, the Second Circuit concluded the teacher's speech was unprotected employee speech. *Id.* at 205.

In *Ross*, the Second Circuit addressed a claim by a school district payroll clerk typist who raised concerns with the district superintendent (though not her direct supervisor) that certain district payments were improper. 693 F.3d at 302–03. The typist was eventually suspended without pay and then wrote a letter "on her personal stationary" to the Board of Education in which she recognized her position as an employee of the school district but explained she was "writing on a personal note" to explain her frustration that her supervisor was not taking appropriate action to remedy the alleged improper payments. *Id.* at 303–04. After the Board received the letter, it voted to terminate the typist. *Id.* at 304. The Second Circuit held that the typist's reporting of "pay irregularities to a supervisor was one of her job duties" because "she

acquired all of the information she relayed . . . in the ordinary course of performing her work, and she was not able to meet her responsibility of balancing the payroll without resolving pay requisition irregularities." *Id.* at 306. The Second Circuit also held that the typist's decision to take her concerns outside the typical chain of command did not alter its holding, nor did the typist's own characterization of her speech as being "on a personal note." *Id.* Lastly, the Second Circuit noted that the typist "never attempted to communicate her complaints to the public." *Id.*

In *Matthews v. City of New York*, the Second Circuit addressed a claim by a police officer to the precinct's commanding officer about arrest quotas the officer felt were damaging to the NYPD's "core mission." 779 F.3d 167, 169 (2d Cir. 2015). The Second Circuit overturned the district court's holding that the officer's speech was unprotected employee speech, explaining that his complaint was "not what [the officer] was 'employed to do'" because he "had no role in setting policy" and "was neither expected to speak on policy nor consulted on formulating policy." *Id.* at 174. Further, the officer's complaint to the commanding officer had a "civilian analogue" because "ordinary citizens . . . are regularly provided the opportunity to raise issues with the Precinct commanders." *Id.* at 176.

In *Montero v. City of Yonkers*, the Second Circuit addressed a claim by a police officer and elected union vice president. 890 F.3d 386, 391 (2d Cir. 2018). At a police union meeting, the officer criticized the president of the union (another officer), stating that the president had a close relationship with the police commissioner and that certain of commissioner's decisions would "adversely affect the [police department], the [union] and the surrounding community." *Id.* After those comments, the acting chief of police instructed the officer to stop criticizing the police commissioner and threatened to transfer him out of the division, but the officer did not stop and later alleged retaliation. *Id.* The Second Circuit held that the officer's speech was

protected citizen speech because it was not part of his employment duties. *Id.* at 398. Instead, the court held that the officer's speech was "as union vice president, a role in which he was not required to serve." *Id.*

Finally, in *Shara*, the Second Circuit addressed a claim by a school bus driver who raised concerns, allegedly on behalf of the union, about matters including bus safety, reporting of bus inspections, and other reporting procedures within the district. 46 F.4th at 81. After the district's Director of Auxiliary Services resolved the proper reporting protocol and the bus driver refused to abide by it, the district placed the bus driver on leave and then terminated him. *Id.* at 81–82. The Second Circuit held that the bus driver had spoken in the course of his ordinary employment duties such that his speech was unprotected employee speech. The Second Circuit distinguished *Montero* because the bus driver "merely asserted that he spoke in his union capacity[,]" which "does not transform his employment-related conversations into speech as a citizen." *Id.* at 86. Next, the court explained that the bus driver's complaints about bus maintenance and proper reporting protocols "constituted an 'indispensable prerequisite' to the successful completion of his role as a bus driver" and "were 'part-and-parcel of [his] concerns about his ability to properly execute his duties.'" *Id.* (quoting *Weintraub*, 593 F.3d at 203). In addition, the Second Circuit explained that "[t]he fact that there is no civilian analogue to this speech . . . reinforced [its] conclusion." *Id.*

### B.    Application to This Case

Applying those cases here, Mr. DiFonzo's speech formed part of his official duties and did not constitute protected citizen speech. Mr. DiFonzo alleges retaliation based on his refusal to certify Ms. K as a drug chemist and comments raising concerns with Dr. Ortt-Gawrys in July and August 2019. Mr. DiFonzo alleges that he told Dr. Ortt-Gawrys certifying Ms. K would be

"unethical, illegal, wrong, and could have serious consequences for the prosecution of drug cases in Niagara County" and because he "regarded the improper certification as a threat to public health and safety." (Doc. 16 ¶¶ 79–82.) Like *Garcetti*, *Weintraub*, *Ross*, and *Shara*, Mr. DiFonzo's concerns about certifying Ms. K too early "constituted an 'indispensable prerequisite' to the successful completion of his role as a [drug chemist and Assistant Director of the Lab]" and "were 'part-and-parcel of [his] concerns about his ability to properly execute his duties.'" *Shara*, 46 F.4th at 86 (quoting *Weintraub*, 593 F.3d at 203).

Plaintiffs respond that, unlike *Garcetti* and *Weintraub*, Mr. DiFonzo's complaints about Ms. K's premature certification did not involve his personal duties.[4] (Doc. 24 at 6; Doc. 33 at 6–7.) But Mr. DiFonzo explained that certification of Ms. K directly implicated his employment responsibilities. Mr. DiFonzo "was the only supervisor with drug chemistry certification that could approve and sign off on Ms. K's training binder[,]" which is why Dr. Ortt-Gawrys instructed him to do it and why Defendants asked him to sign off and back date the signature before he resigned. (Doc. 16 ¶¶ 70, 75, 310–312.) Like the memo at issue in *Garcetti*, in refusing to sign off on Ms. K's binder and expressing his concerns to Dr. Ortt-Gawrys about doing so, Mr. DiFonzo "fulfill[ed] [his] responsibility to advise his superior about how best to proceed with" Ms. K's certification. *Garcetti*, 547 U.S. at 421. Furthermore, to the extent that

---

[4] Mr. DiFonzo's and Ms. Rogers' attempt to distinguish *Garcetti* and *Weintraub* focus on minute factual differences between those cases and their case. (Doc. 24 at 5–6; Doc. 33 at 6–7.) But, as is often true, there is no case on all-fours with the facts of this case; *Garcetti* and *Weintraub* are analogous, and their reasoning applies here. Similarly, Plaintiffs' attempt to distinguish *Shara* blends the distinct analyses of whether the bus driver's speech was citizen speech and whether his speech was on a matter of public concern. (*See* Doc. 24 at 6–7.) But while the Second Circuit discussed both analyses together in explaining its earlier decision in *Montero*, it did not hold or suggest that the analyses were to be blended or used as some sort of sliding scale in the way that Plaintiffs suggest. *See Shara*, 46 F.4th at 83–84, 86. As a result, the court rejects Plaintiffs' arguments on these points.

Mr. DiFonzo's argument is that his complaint to Dr. Ortt-Gawrys was not explicitly part of his job duties, the Second Circuit already rejected that precise argument. *Weintraub*, 593 F.3d at 203.

Plaintiffs also argue that, beyond any concerns about his job, Mr. DiFonzo raised concerns about the effect Ms. K's certification could have on the general public. (Doc. 24 at 6–7; Doc. 33 at 8.) Mr. DiFonzo was concerned about the prosecution of future criminal cases, the integrity of the Lab, potential wrongful convictions, and "about public safety and health." (*Id.* ¶¶ 80–84, 90–94.) On this argument, the Southern District of New York's opinion in *D'Olimpio v. Crisafi* is particularly instructive. 718 F. Supp. 2d 340 (S.D.N.Y. 2010) (Rakoff, J.), *aff'd*, 462 F. App'x 79 (2d Cir. 2012). In that case, the court addressed a claim by a police officer that he was retaliated against after making certain internal complaints that another officer was violating suspects' rights. *Id.* at 342–47, 353. The court concluded that the complaining officer's speech was unprotected employee speech because it was part of his employment duties to "ensur[e] that investigations and arrests of narcotics abuses are lawfully conducted." *Id.* at 353. The officer's speech "related to ensuring the safety of citizens and the constitutional rights of suspects." *Id.* at 354.

So too here. Mr. DiFonzo alleges that he lodged his concerns with Dr. Ortt-Gawrys because Ms. K's approval "could have serious consequences for the prosecution of drug cases in Niagara County" and "regarded the improper certification as a threat to public health and safety" because "there could be repercussions for future criminal cases" and "[a]n innocent person could have been convicted and incarcerated." (Doc. 16 ¶¶ 80–82, 90.) The court's conclusion in *D'Olimpio* applies squarely to these allegations. *Cf. D'Olimpio*, 718 F. Supp. 2d at 353–54. Plaintiffs distinguish *D'Olimpio* on the basis that the officer's internal reports were explicitly

part of his job duties while Mr. DiFonzo's complaint to Dr. Ortt-Gawrys was not. (Doc. 33 at 7–8.) But again, the Second Circuit has rejected this distinction. *Weintraub*, 593 F.3d at 203.

Several other considerations support the court's conclusion. First, Mr. DiFonzo acquired all the information related to his complaint as part of his employment. *Cf. Ross*, 693 F.3d at 306. While that fact alone cannot transform his speech into citizen speech, *Lane*, 573 U.S. at 239, it is another reason weighing against Plaintiffs here. Moreover, Mr. DiFonzo was not speaking outside of his employment duties as a union representative, for example. *Cf. Montero*, 890 F.3d at 398; *see also Shara*, 46 F.4th at 84 (explaining that *Montero* does not stand for the proposition that speaking as a union member categorically transforms employee speech into citizen speech).

Second, the Plaintiffs do not allege that Mr. DiFonzo ever conveyed his concerns to the general public. *Ross*, 693 F.3d at 306; *Weintraub*, 593 F.3d at 203–204. There is also no "civilian analogue" to Mr. DiFonzo's speech. *Cf. Shara*, 46 F.4th at 83, 86–87; *Matthews*, 779 F.3d at 176 (officer's mode of complaint to precinct commanders was open to general public). To begin, Dr. Ortt-Gawrys "hardly constitute[s] 'an independent state agency' responsible for entertaining complaints by 'any citizen in a democratic society regardless of his status as a public employee.'" *Shara*, 46 F.4th at 86–87 (quoting *Jackler v. Byrne*, 658 F.3d 225, 241 (2d Cir. 2011)). Similarly, civilians neither evaluate a drug chemist-in-training like Mr. DiFonzo could evaluate Ms. K nor file complaints with the director of the Niagara County Forensics Lab because they think an employee certified one of the drug chemists-in-training too early.

Plaintiffs respond that New York has a commission established to monitor public forensic laboratories' compliance with New York's accreditation requirements. (Doc. 24 at 7; Doc. 33 at 8–9.) According to Mr. DiFonzo and Ms. Rogers, that commission includes two citizen at large members and is tasked with questioning irregularities and engaging "in the very same speech that

Plaintiff DiFonzo engaged in when he challenged Defendants." (Doc. 24 at 7; Doc. 33 at 8–9.)
Plaintiffs are right that such a commission exists and that it has civilians on it, but their argument
on this point still fails. That is because Plaintiffs have not demonstrated that this commission,
called the Commission on Forensic Science, could lodge a complaint with someone in the
position of Dr. Ortt-Gawrys for certifying a drug chemist-in-training that another drug chemist
deemed unqualified. The Commission's responsibilities are not so granular, and the Commission
is not responsible for monitoring the daily operations of forensic labs in the state. *See* N.Y. Exec.
Law § 995-b.[5] Instead, the Commission is responsible for developing minimum standards and a
program of accreditation for labs, maintaining certain records, promulgating a policy for
establishing a DNA identification index, and other big-picture tasks. *See id.* It is not tasked with
either monitoring the certification of individual drug chemists-in-training or filing complaints
against lab directors for certifying chemists before they are prepared. *Cf. Shara*, 46 F.4th at 86–
87.

 Finally, this case does not present factual questions that preclude the court from granting
Defendants' motion to dismiss. Writing in dissent in *Shara*, Judge Pooler argued that the court
should not find the speech in question to be unprotected employee speech without further factual
development. *Id.* at 92 (Pooler, J., dissenting). But the questions Judge Pooler raised in *Shara* are
not present here. Unlike *Shara*, Mr. DiFonzo's speech was not policy-oriented speech
concerning, for example, the Lab's general policy for approving all drug chemists-in-training
broadly speaking. *Cf. id.* (citing and comparing bus driver's speech to the police officer's policy-

---

[5] "The Court may take judicial notice of state statutes." *Barkai v. Mendez*,
__ F. Supp. 3d __, 2022 WL 4357923, at *13 (S.D.N.Y. Sep. 20, 2022) (collecting cases);
*see also Christman v. Skinner*, 468 F.2d 723, 726 (2d Cir. 1972) (holding that district court
properly took notice of state regulation in considering motion to dismiss).

oriented complaint in *Matthews*). Instead, it concerned only Ms. K's premature certification specifically. Nor did Mr. DiFonzo's speech have a civilian analogue, as Judge Pooler argued existed in *Shara* because the bus driver in that case had filed a freedom of information request. *Cf. id.* at 93. Lastly, Judge Pooler noted that the bus driver's comments were made "in his capacity as union vice president." *Id.* Mr. DiFonzo's comments were not made in any such capacity. Thus, while certain First Amendment retaliation claims may not be conducive to resolution on a motion to dismiss, this case does not involve the same uncertainties as those Judge Pooler identified in *Shara*.

Therefore, the court concludes that Plaintiffs failed to state a viable First Amendment retaliation claim and grants Defendants' motion to dismiss Count I of Plaintiffs' Amended Complaint. As a result, the court does not address the question of whether Mr. DiFonzo's speech constituted a matter of public concern nor does the court address the other necessary elements of a First Amendment retaliation claim. *See D'Olimpio*, 718 F. Supp. 2d at 354 n.7.

## II.   Counts II–IV: Defamation, IIED, Negligent Hiring and Supervision

All of Mr. DiFonzo's and Ms. Rogers' remaining claims are for state-law causes of action. Where a federal court dismisses the only federal-law cause of action, it may, in its discretion, decline to continue to exercise supplemental jurisdiction over the remaining state-law causes of action. 28 U.S.C. § 1367(c)(4); *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006). In making that discretionary decision, a district court must balance judicial economy, convenience, fairness, and comity. *Id.* "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.* (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)); *see also United Mine Workers of Am. v. Gibbs*,

383 U.S. 715, 726 (1966) ("[I]f the federal law claims are dismissed before trial . . . the state claims should be dismissed as well.").

Here, the court will dismiss the sole federal-law claim at the motion to dismiss stage. The parties have not yet begun discovery. Therefore, the court declines to exercise supplemental jurisdiction over Mr. DiFonzo's and Ms. Rogers' remaining state-law causes of action and dismisses their Amended Complaint in full.

## Conclusion

For the foregoing reasons, the Defendants' motions to dismiss (Docs. 15, 27) are both GRANTED, and the Plaintiffs' Amended Complaint is DISMISSED. The dismissal is without prejudice.

Dated this 7th day of February, 2023.

Geoffrey W. Crawford, Judge
United States District Court