UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| THOMAS J. DIFONZO and LAUREN ROGERS, ) ) ) | |
| Plaintiffs, ) ) ) | |
| v. ) ) | Case No. 1:22-cv-588 |
| COUNTY OF NIAGARA, RICHARD E. UPDEGROVE, NIAGARA COUNTY SHERIFF'S OFFICE, MICHAEL J. FILICETTI, and DR. KORI ORTT-GAWRYS, ) ) ) ) ) ) ) | |
| Defendants. ) | |

**ORDER ON MOTION TO ALTER, AMEND, RECONSIDER, OR VACATE JUDGMENT**
**(Doc. 39)**

The court granted Defendants' motion to dismiss Plaintiffs' sole federal-law claim for First Amendment retaliation and declined to exercise supplemental jurisdiction over the remaining state-law claims. *DiFonzo v. County of Niagara*, No. 22-cv-588, 2023 WL 1801695, at *10 (W.D.N.Y. Feb. 7, 2023). Plaintiffs now move the court to alter, amend, reconsider, or vacate that judgment, arguing that the court mistakenly addressed Mr. DiFonzo's two utterances in July and August 2019 together and that the court's conclusion about the lack of a civilian analogue to Mr. DiFonzo's speech was incorrect. (*See* Doc. 39.) Defendants oppose Plaintiffs' motion, arguing that the court's original conclusion was correct.[1] (*See* Docs. 43, 44.) Because Plaintiffs' arguments do not identify any change in controlling law, any new evidence, any clear error, or any need to prevent manifest injustice, the court denies Plaintiffs' motion.

---

[1] Dr. Ortt-Gawrys filed a separate brief in opposition. (Doc. 44.) The court again refers to all of the named defendants collectively as "Defendants" where appropriate.

## Background

The court recited the factual allegations in detail in its earlier order. *DiFonzo*, 2023 WL 1801695, at *1–4. Relevant to this motion, Plaintiffs claim that Defendants retaliated against them in violation of the First Amendment for two comments that Mr. DiFonzo made to Dr. Ortt-Gawrys in July and August 2019. The court summarized the two instances alleged in Plaintiffs' Amended Complaint:

- "[A]t the end of July 2019, Dr. Ortt-Gawrys directed Mr. DiFonzo to approve Ms. K for drug chemistry analysis and to sign off on her training binder. Mr. DiFonzo refused because it would be unethical to approve her when neither [Mr. DiFonzo] nor anyone else had trained her and she was not ready." *Id.* at *2 (internal quotation marks and citations omitted).
- Dr. Ortt-Gawrys approved Ms. K anyway while Mr. DiFonzo was on vacation in August 2019. "When Mr. DiFonzo returned from vacation, he was alarmed and expressed his concern to Dr. Ortt-Gawrys that her decision to approve Ms. K . . . was unethical, illegal, wrong, and could have serious consequences for the prosecution of drug cases in Niagara County and because he regarded the improper certification as a threat to public health and safety." *Id.* (internal quotation marks and citations omitted).

After the court issued its order granting Defendants' motion to dismiss, Plaintiffs filed the present motion to alter, amend, reconsider, or vacate under Federal Rule of Civil Procedure 59.[2] (Doc. 39.) Defendants responded in opposition (Docs. 43, 44), Plaintiffs filed a reply (Docs. 45,

---

[2] In their motion, Plaintiffs refer to Local Civil Rule 6.3. (Doc. 39-2 at 7.) There is no Local Civil Rule 6.3 in the Western District of New York. The court, therefore, rules based on Federal Rule of Civil Procedure 59 only.

46[3]), and the defendants, except for Dr. Ortt-Gawrys, filed a sur-reply with leave of the court (Doc. 51). The court elects to rule on the papers.

## Legal Standard

Under Federal Rule of Civil Procedure 59(e), a party may file a "motion to alter or amend a judgment." "A motion for reconsideration may not be used to advance new facts, issues or arguments not previously presented to the Court, nor may it be used as a vehicle for relitigating issues already decided by the Court." *R.F.M.A.S., Inc. v. Mimi So*, 640 F. Supp. 2d 506, 509 (S.D.N.Y. 2009) (quoting *Davidson v. Scully*, 172 F. Supp. 2d 458, 461 (S.D.N.Y. 2001)). Instead, the moving party must identify "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 729 F.3d 99, 104 (2d Cir. 2013) (quoting *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)). "A party's fundamental disagreement with a court's legal analysis and conclusions as to a matter fully considered does not serve as sufficient ground to warrant reconsideration of the court's decision." *R.F.M.A.S., Inc.*, 640 F. Supp. 2d at 512.

## Analysis

Plaintiffs advance two chief arguments as to why the court should reconsider its earlier judgment. First, Plaintiffs argue that the court should have analyzed Mr. DiFonzo's July 2019 and August 2019 comments to Dr. Ortt-Gawrys separately. (Doc. 39-2 at 11–12.) Related to that argument, Plaintiffs assert that Mr. DiFonzo's August 2019 utterance was *not* part of his job responsibilities because multiple people allegedly explicitly told him so. (*Id.* at 8–11.) Second,

---

[3] Plaintiffs filed two reply memoranda. (*See* Docs. 45, 46.) As the later-filed document has arguments not contained in the former, the court refers to the later-filed document only.

3

Plaintiffs argue that the court's analysis about the civilian analogue to Mr. DiFonzo's speech was incorrect because it overlooked certain additional evidence. (*Id.* at 13–18.) Related to this second argument, Plaintiffs argue that there is also a second *additional* civilian analogue the court should have considered. (*Id.* at 18–20.) Defendants oppose Plaintiffs on each of these arguments. (*See* Docs. 43, 44.)

In their reply, Plaintiffs point to a recent Notice of Violations that the New York Commission on Forensic Science issued to the Niagara County Forensic Lab, which they argue is yet another reason and additional evidence supporting their argument about the civilian analogue. (Doc. 46 at 4, 7, 9–12.) The defendants, except for Dr. Ortt-Gawrys, oppose this additional argument as well. (Doc. 51 at 4–7.)

The court addresses each argument in turn.

I. **The Court's Analysis of July and August 2019 Utterances**

Plaintiffs first argue that the court incorrectly analyzed Mr. DiFonzo's speech in July 2019 and August 2019 together. (Doc. 39-2 at 11–12.) According to Plaintiffs "the Court combined the July and August 2019 Utterances, and analyzed them as if they were both related *to the decision to certify Ms. K.*" (*Id.* at 11.) That was improper, Plaintiffs contend, because the July 2019 utterance was related to Mr. DiFonzo's refusal to certify Ms. K as a drug-chemist while the August 2019 utterance was not. (*Id.*)

Defendants argue that the court correctly analyzed them together and that Plaintiffs' attempt to differentiate the speech falls flat. (Doc. 43 at 11–13; Doc. 44 at 2–5.) In addition, Defendants argue that Plaintiffs themselves treated the July and August 2019 utterances together in their complaint. (Doc. 43 at 12–13; Doc. 44 at 3–5.)

4

### A. The Court Analyzed Plaintiffs' Allegations as Presented

To begin, Defendants are correct that Plaintiffs often referred to both utterances collectively in their Amended Complaint. (*See, e.g.*, Doc. 16 ¶¶ 146, 183, 203, 321, 325, 403(b).) For example, Plaintiffs alleged that "Plaintiff DiFonzo's utterances at the end of July 2019 and, more specifically, August 2019 constitute protected speech as that term is defined in the Constitution and in cases interpreting the First Amendment."[4] (*Id.* ¶ 321.) The court treated the utterances collectively because Plaintiffs treated them collectively. This argument does not demonstrate "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Kolel Beth Yechiel Mechil of Tartikov, Inc.*, 729 F.3d at 104 (internal quotation marks omitted). As a result, the court denies Plaintiffs' motion on this basis.

### B. Plaintiffs' Arguments Do Not Affect the Court's Conclusion

Even addressing Plaintiffs' argument on its merits, however, it does not alter the court's conclusion. According to Plaintiffs, Mr. DiFonzo's August 2019 speech did *not* relate to his refusal to certify Ms. K. (Doc. 39-2 at 11.) But this cannot be squared with their Amended Complaint. Plaintiffs asserted that "Plaintiff DiFonzo was the only supervisor with drug chemistry certification that could approve and sign off on Ms. K's training binder." (Doc. 16 ¶ 75; *see also id.* ¶ 52 (explaining that only the signature of the supervising drug chemist is necessary to certify a drug-chemist-in-training).) And Plaintiffs alleged that Dr. Ortt-Gawrys signed off on Ms. K's training binder while Mr. DiFonzo was away on vacation but did not have

---

[4] This is a legal conclusion which the court was not bound to accept at the motion-to-dismiss stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

5

the authority to do so.[5] (*Id.* ¶¶ 76–77.) When he returned "Plaintiff DiFonzo expressed alarm at what had occurred." (*Id.* ¶ 79.) In short, even if Plaintiffs argue that Mr. DiFonzo's August 2019 speech was *not* about his refusal to certify Ms. K, their Amended Complaint makes clear that Mr. DiFonzo's speech was related to his frustration with Dr. Ortt-Gawrys' decision to certify Ms. K after Mr. DiFonzo refused to do so.

As part of this same argument, Plaintiffs assert that Mr. DiFonzo's August 2019 utterance "expressed alarm that [Dr.] Ortt-Gawrys, a public official, had acted illegally and unethically, and had jeopardized the health and safety of Niagara County residents." (Doc. 39-2 at 11–12.) This is making a narrow distinction. Plaintiffs seem to be arguing that Mr. DiFonzo's August 2019 speech was not about his refusal to certify Ms. K but, rather, the *effects* of Dr. Ortt-Gawrys' certification; Plaintiffs argue that these concerns were *not* part of his job duties. (*See id.*) But Plaintiffs' Amended Complaint also contradicts this argument. Plaintiffs alleged that Mr. DiFonzo and Ms. Rogers had to help Ms. K multiple times with drug analyses after her certification and that Mr. DiFonzo caught one of Ms. K's mistakes. (Doc. 16 ¶¶ 85–89.) And Mr. DiFonzo was, at the time, the Assistant Laboratory Director responsible for "supervising the drug chemistry department" and "review[ing] many of the cases that involved drug chemistry," among other duties. (*Id.* ¶¶ 23, 25.) Stated simply, assuming Dr. Ortt-Gawrys did certify Ms. K, Plaintiffs' pleading makes clear that the *effects* of that certification, including Ms. K's potential for errors and Mr. DiFonzo's additional oversight of Ms. K, directly implicated Mr. DiFonzo's job responsibilities as the Assistant Laboratory Director.

---

[5] Plaintiffs' argument on this point also elides another problem. Plaintiffs never reconcile the allegation that Mr. DiFonzo was the only one who could certify Ms. K but that Dr. Ortt-Gawrys apparently did so anyway. If Dr. Ortt-Gawrys certified Ms. K, there would have been no need for Defendants to ask Mr. DiFonzo to sign off on Ms. K's training binder and back-date that signature, as Plaintiffs also allege. (Doc. 16 ¶¶ 310–315.)

Plaintiffs also argue that Mr. DiFonzo's August 2019 utterance "did not relate to the implicit health and safety concerns that *his job performance* may implicate." (Doc. 39-2 at 11.) But the court already addressed this argument. *DiFonzo*, 2023 WL 1801695 at *8. On that point, Plaintiffs have not demonstrated any change in controlling law, clear mistake of law, additional evidence, or need to prevent manifest injustice. *See Kolel Beth Yechiel Mechil of Tartikov, Inc.*, 729 F.3d at 104. Instead, Plaintiffs want to relitigate the court's legal analysis, which is not a basis to grant Plaintiffs' motion for reconsideration. *R.F.M.A.S., Inc.*, 640 F. Supp. 2d at 512.

Even addressing this point on its merits, however, it also fails. Plaintiffs argue that the court incorrectly concluded that Mr. DiFonzo's concerns for public health and safety were implicitly part of his job duties and now make the narrow distinction that his August 2019 comments were about his personal concerns, not concerns that his job *performance* might *implicitly* involve. (Doc. 39-2 at 11–12.) According to Plaintiffs, the court's conclusion was wrong because they alleged that Mr. DiFonzo's August 2019 utterance was:

> [N]ot related to [his] personal work duties, nor were they motivated out of concerns that he would personally be held responsible. [Mr.] DiFonzo could have withheld his concerns for public safety, health, and the integrity of the law enforcement system, and still fulfilled his own job responsibilities, which is exactly what Defendants implied when [Mr. DiFonzo] reported that he was being retaliated against for raising concerns . . . in the first place.

(Doc. 16 ¶ 330.) But this argument cannot be squared with Plaintiffs' Amended Complaint either.

In the very same paragraph, Plaintiffs explained that "the safety of the community depends upon the Forensics laboratory accurately identifying fentanyl, for example." (*Id.* ¶ 330.) And Mr. DiFonzo's role as the Assistant Laboratory Director meant that he "was responsible for receiving evidence, analyzing evidence, maintaining and calibrating equipment, storing evidence, destroying evidence after the requisite time had passed, [and] testifying in court cases."

7

(*Id.* ¶ 23.) Critically, Mr. DiFonzo was also responsible for supervising the drug chemistry department (*id.* ¶ 23), for overseeing the accuracy of its work (*id.* ¶ 25), and for approving the certification of a drug-chemist-in-training (¶ 75).

The approval process for a new chemist was important, Plaintiffs explained, because it "is essential to ensure the integrity of the entire criminal justice system"; "prevents an injustice to those whose results are being analyzed because . . . an accused person could be wrongly convicted of a crime they did not commit"; "helps ensure that an accused person is absolved when they have committed a crime"; and "helps maintain the integrity of the evidence laboratory so that the entire criminal justice process is not called into question." (*Id.* ¶¶ 54–56.) That Plaintiffs also allege, on the other hand, that Mr. DiFonzo, as the Assistant Laboratory Director, was not responsible for public safety, health, or even the integrity of the law enforcement system (*id.* ¶ 330) cannot be reconciled with the rest of the Amended Complaint. Quite clearly, Mr. DiFonzo's position involved responsibility for public safety, health, and the integrity of the law enforcement system. As a result, the court also rejects this argument as a basis for revisiting its earlier opinion.

Lastly, Plaintiffs argue that the August 2019 is different and distinct from the July 2019 utterance because *after* Mr. DiFonzo's July 2019 utterance refusing to certify Ms. K, Defendants repeatedly told Mr. DiFonzo that his legal and ethical concerns with prematurely certifying a drug-chemist-in-training were *not* part of his job responsibilities.[6] (Doc. 39-2 at 8–10 (citing and

---

[6] As part of this argument, Plaintiffs direct the court to their briefing on the motion to dismiss to support their allegations. (Doc. 39-2 at 9–10 (citing and quoting Doc. 33).) But Plaintiffs' briefing on this motion quotes from both their earlier brief and the Amended Complaint interchangeably. (*See id.*) The court's role at the motion-to-dismiss stage is only to analyze the allegations in the complaint, not any additional allegations in a party's briefing. *Friedl v. City of New York*, 210 F.3d 79, 84 (2d Cir. 2000).

8

quoting Doc. 16 ¶¶ 61–82, 73, 155, 158, 161, 203–205, 330).) But this argument also runs into several problems. Most critically, the majority of the Amended Complaint to which Plaintiffs cite does not support their argument. Instead, these paragraphs allege that certain parties instructed Mr. DiFonzo to attempt to get along with Dr. Ortt-Gawrys despite their disagreements. (*See* Doc. 16 ¶¶ 158, 161, 330.) Certain other paragraphs do not address this proposition, even construing all inferences in Plaintiffs' favor. (*See id.* ¶¶ 61–82, 73, 155, 203–205.)

Only two paragraphs arguably support Plaintiffs' position. In paragraph 330 Plaintiffs allege that Mr. DiFonzo's "concerns were not related to [Mr. DiFonzo's] personal work duties" and that he "could have withheld his concerns for public safety, healthy, and the integrity of law enforcement system, and still fulfilled his own job responsibilities, which is exactly what Defendants *implied*." (*Id.* ¶ 330 (emphasis added).) But that does not support the proposition that Defendants "repeatedly told" Mr. DiFonzo that his concerns about public health, safety, and the integrity of law enforcement were not part of his job duties. (Doc. 39-2 at 5, 8–11.)

In Paragraph 334 Plaintiffs allege that Dr. Ortt-Gawrys was targeting Mr. DiFonzo because he "spoke up about the implications of the unethical and improper certification of Ms. K." (Doc. 16 ¶ 334.) They allege that Defendants brushed aside his concerns as a personality clash. (*Id.*) Plaintiffs also allege that "Defendants repeatedly told him that it was not his place to express these types of concerns, and it did not fall within his area of responsibility." (*Id.*) It is not clear whether this references Mr. DiFonzo's concern about his relationship with Dr. Ortt-Gawrys or his underlying concerns about what he considered to be the implications of her conduct. But, even assuming it is the latter, as the court already explained in detail, Plaintiffs' allegations demonstrate that the effects of Dr. Ortt-Gawrys' alleged premature certification of Ms. K directly

9

implicated Mr. DiFonzo's job responsibilities as Plaintiffs described them in the Amended Complaint.

Plus, as the court already explained in its earlier opinion, "speech can be 'pursuant to' a public employee's official job duties even though it is not required by, or included in, the employee's job description, or in response to a request by the employer." *DiFonzo*, 2023 WL 1801695, at *6 (quoting *Weintraub v. Bd. of Educ.*, 593 F.3d 196, 203 (2d Cir. 2010)). The court adds here that, as explained in detail above, Mr. DiFonzo's job duties directly implicated public health, safety, and the integrity of law enforcement even if Defendants allegedly implied otherwise. In other words, Mr. DiFonzo's "grievance was pursuant to his official duties because it was part-and-parcel of his concerns about his ability to properly execute his duties" and it was "undertaken in the course of performing his primary employment responsibilit[ies]" as the Assistant Director of the Lab, in charge of supervising and overseeing drug analysis, and as the only chemist who could certify Ms. K. *Weintraub*, 593 F.3d at 203 (internal quotation marks omitted). Plaintiffs disagree with this legal analysis and conclusion. But that is not a basis for the court to grant a motion for reconsideration. *R.F.M.A.S., Inc.*, 640 F. Supp. 2d at 512.

Therefore, the court denies Plaintiffs' motion based on these arguments.

## II. The Court's Analysis of the Relevant Civilian Analogue

Plaintiffs' second argument is that the court incorrectly concluded that the New York Commission on Forensic Science is not civilian analogue to Mr. DiFonzo's speech. (Doc. 39-2 at 13–18.) In addition, Plaintiffs argue that there is a separate civilian analogue the court *should* have considered. (*Id.* at 18–22.) Defendants oppose both arguments. (Doc. 43 at 14–17; Doc. 44 at 6–8.) The court addresses each in turn.

10

### A.   Plaintiffs' Arguments About the New York Commission on Forensic Science Do Not Affect the Court's Conclusion

In their briefing on the motion to dismiss, Plaintiffs raised the argument that there was a civilian analogue to Mr. DiFonzo's speech in the New York Commission on Forensic Science. (Doc. 24 at 12; Doc. 33 at 8–9.) The court considered this argument and rejected it, explaining:

> The Commission's responsibilities are not so granular, and the Commission is not responsible for monitoring the daily operations of forensic labs in the state. Instead, the Commission is responsible for developing minimum standards and a program of accreditation for labs, maintaining certain records, promulgating a policy for establishing a DNA identification index, and other big-picture tasks. It is not tasked with either monitoring the certification of individual drug chemists-in-training or filing complaints against lab directors for certifying chemists before they are prepared.

*DiFonzo*, 2023 WL 1801695, at *9 (citations omitted).

Homing in on the last sentence of that paragraph, Plaintiffs argue that the Commission "does indeed monitor the individual certification of individual drug chemists-in-training, and file complaints against lab directors for certifying chemists before they are prepared." (Doc. 39-2 at 13.) According to Plaintiffs, certain of the meetings demonstrate the Commission raised "concerns about the numerous personnel changes" at the Lab; "asked about 'a consultant completing their casework without completing their competency testing'"; asked for certain records from the Niagara County lab, including personnel records; asked about the training background for certain employees; and addressed other personnel concerns bearing on the Niagara County Forensic Lab. (*Id.* at 13–18 (citations omitted).) This argument, however, fails for three separate reasons.

First, and most critically, a court's inquiry into whether there is a civilian analogue to a public employee's speech is not dispositive. As the Second Circuit recently explained, a court "may ask whether a civilian analogue to the employee's speech exists" but qualified that "[w]hile this latter inquiry may be of some help in determining whether an employee speaks as a citizen,

11

we have emphasized that the heart of our analysis is whether the speech at issue is itself ordinarily within the scope of an employee's duties." *Shara v. Maine-Endwell Cent. Sch. Dist.*, 46 F.4th 77, 83 (2d Cir. 2022) (internal quotation marks and citations omitted). In other words, even if the court's conclusion about the civilian analogue here was incorrect, it would not undermine the "heart" of the court's analysis that Mr. DiFonzo's speech was within the scope of his employment duties.

Second, Plaintiffs incorrectly focused their attention on the Commission simply because it includes two members-at-large. But there is a serious question whether a commission such as the Commission on Forensic Science is a relevant "civilian analogue" at all. The Governor appoints the members of this Commission, and most of the positions are reserved for people with specialized training or experience. *See* N.Y. Exec. Law § 995-a(2). The two at-large members must be recommended by the "temporary president of the senate" and the "speaker of the assembly," respectively. *Id.* In other words, this Commission is not open to all civilians like the other civilian analogues that courts have accepted in equivalent cases. As described in more detail below, the Commission's speech related to investigating forensic labs and issuing notices that their accreditation might be suspended or revoked is not like avenues of speech open to citizens such as "writing a letter to a local newspaper" or "discussing politics with a co-worker." *Garcetti v. Ceballos*, 547 U.S. 410, 423–24 (2006). It is also not like a truthful police report. *Jackler v. Byrne*, 658 F.3d 225, 234 (2d Cir. 2011). Instead, as the court already explained in its earlier opinion, the Commission's speech is not available to the general public. *DiFonzo*, 2023 WL 1801695, at *9. This makes the Commission's speech more like the lodging of a union grievance, *Weintraub*, 593 F.3d at 204, or a complaint lodged directly with a precinct commander, *Matthews v. City of New York*, 779 F.3d 167, 175–76 (2d Cir. 2015).

12

Third, on its merits, Plaintiffs' argument based on the minutes of the meetings to which they directed the court does not alter the court's analysis. The statute delineating the powers of the Commission states:

> The commission shall develop minimum standards and a program of accreditation for all forensic laboratories in New York state, including establishing minimum qualifications for forensic laboratory directors and such other personnel as the commission may determine to be necessary and appropriate, and approval of forensic laboratories for the performance of specific forensic methodologies . . . .

N.Y. Exec. Law § 995-b(1). The statute then sets out certain minimum requirements for the accreditation of forensic labs that the Commission must establish, including, for example, an initial inspection; routine inspections; "proficiency testing of all laboratory personnel involved in forensic analysis"; and quality control mechanisms. *Id.* § 995-b(3). And the statute gives the Commission the power to suspend or revoke a lab's accreditation. *Id.* § 995-b(3)(e). In that instance, the Commission must serve "written notice of the alleged violation." *Id.* § 995-b(3)(f). Finally, as relevant here, the statute states that "[a] laboratory director who knowingly operates a laboratory without obtaining the accreditation required by this article, or who, with the intent to mislead or deceive, misrepresents a material fact to the commission or DNA subcommittee, shall be subject to a civil penalty." *Id.* § 995-b(4).

That the Commission inquired about personnel changes, personnel qualifications, the staff conducting certain analyses, and other matters at the Niagara County Forensic Lab was part of the Commission's statutory duty to monitor the accreditation of the lab. *Id.* § 995-b(e), (f). This is the precise distinction the court already made. *DiFonzo*, 2023 WL 1801695, at *9. Any concern the Commission may have had about individual chemists might affect the lab's accreditation, as Plaintiffs explained in their Amended Complaint. (Doc. 16 ¶ 50.) Furthermore, the statute does not empower the Commission to make complaints against individual lab directors for certifying a drug-chemist-in-training too early. Instead, the statute details that lab

13

directors are not immune from civil penalties up to $7,500 "and such other penalties as are prescribed by the law." N.Y. Exec. Law § 995-b(4). But that is not the same thing. And Plaintiffs have no legal support for their contention to the contrary. (*See* Doc. 39-2 at 17.) Besides, Mr. DiFonzo's August 2019 speech was *not* about the lab's accreditation; it was about the consequences for prosecuting future cases, the threat to public health and safety, and the integrity of the Lab.[7] (*Id.* ¶¶ 79–82.) As a result, the court rejects Plaintiffs' argument on this point.

### B. Plaintiffs' Argument About the Recent Notice of Violations Does Not Affect the Court's Conclusion

In their reply brief, Plaintiffs assert that a recent development should alter the court's conclusion. (*See, e.g.*, Doc. 46 at 4.) Plaintiffs represent that the Commission issued a Notice of Violations to the Niagara County Forensic Lab on March 10, 2023. (*Id.*) According to Plaintiffs, this Notice of Violations directly addresses the court's analysis of this civilian analogue; demonstrates that the Commission *can* file complaints with a lab's director; and "conclusively establishes that the Commission is a relevant citizen analogue." (*Id.* at 10–11.) The defendants, except for Dr. Ortt-Gawrys, oppose this argument. (Doc. 51 at 4–7.)

Assuming the court can consider this document for purposes of evaluating Plaintiffs' present motion, however, it does not alter the court's analysis.[8] That is because the Notice of

---

[7] Ms. K apparently did raise concerns about the Lab's accreditation. (Doc. 16 ¶ 78.) But her speech is not at issue in this suit, and it does not alter this analysis.

[8] Courts generally "do not consider arguments raised for the first time in a reply brief." *Montanio v. Keurig Green Mountain, Inc.*, 276 F. Supp. 3d 212, 223 (D. Vt. 2017). In addition, this document was not a basis for Plaintiffs' complaint, the only document the court reviewed. Because Plaintiffs' Amended Complaint preceded the Notice of Violations, the Notice was not attached or incorporated in their Amended Complaint. For the same reason the Notice was also not "integral" to Plaintiffs' pleading because "[f]or a document to be integral to a complaint, 'the plaintiff must have (1) actual notice of the extraneous information and (2) relied upon the document in framing the complaint.'" *Pucilowski v. Spotify USA, Inc.*, No. 21 Civ. 1653, 2022

14

Violations confirms the powers of the Commission as the court described them. The Notice of Violations is directed to the Niagara County Sheriff's Office Forensic Laboratory. (*See* Doc. 47 at 14.) This is what the statute directs the Commission to do. *See* N.Y. Exec. Law § 995-b(3)(f). In fact, the Notice of Violations invokes the same subsection of the statute. (*See* Doc. 47 at 14.)

That the letter's salutation includes the current director of the lab does not alter that conclusion. (*See id.*) The statute directs the Commission to mail the notice "by certified mail to the holder of the forensic laboratory accreditation at the address of such holder." N.Y. Exec. Law § 995-b(3)(f). This does not demonstrate, as Plaintiffs contend, that the Commission may file complaints directly with the director of a forensic laboratory. Instead, it demonstrates that the Commission must mail notices of possible violations to the laboratory by sending that notice to the holder of the accreditation. Finally, the Notice of Violations does not state anything about certifying a drug-chemist-in-training too early. (*See* Doc. 47). Instead, it outlines generally the same five statutory bases upon which the Commission may suspend or revoke a forensic lab's accreditation. (*Compare* Doc. 47 at 14–15, *with* N.Y. Exec. Law § 995-b(3)(e)(i)–(v).) In fact, the Notice cites that same subsection of the statute. (*See* Doc. 47 at 14–15.) As a result, the Notice of Violations does not alter the court's earlier analysis let alone "conclusively establish" that the Commission is a civilian analogue.

Plaintiffs' arguments on this point do not identify "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Kolel Beth Yechiel Mechil of Tartikov, Inc.*, 729 F.3d at 104 (internal quotation marks omitted). Therefore, the court rejects Plaintiffs' motion on this basis.

---

WL 836797, at *3 (S.D.N.Y. Mar. 21, 2022) (cleaned up) (quoting *DeLuca* v. *AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010)).

### C. Plaintiffs' Argument About a Second Civilian Analogue Does Not Affect the Court's Analysis

Finally, Plaintiffs argue that the court overlooked another civilian analogue to Mr. DiFonzo's speech here, the Niagara County Sheriff's Department. (Doc. 39-2 at 19.) According to Plaintiffs "citizens always have the right to complain to the Sheriff or the Sheriff's Laboratory director." (*Id.* at 20.) Defendants assert that this argument is deficient for several reasons. (Doc. 43 at 16–17; Doc. 44 at 8.)

Plaintiffs' argument on this point also does not alter the court's earlier analysis and conclusion. As the court already explained, "civilians neither evaluate a drug chemist-in-training like Mr. DiFonzo could evaluate Ms. K nor file complaints with the director of the Niagara County Forensics Lab because they think an employee certified one of the drug chemists-in-training too early." *DiFonzo*, 2023 WL 1801695, at *9. That same analysis still applies and also addresses Plaintiffs' argument about the potential for a citizen to direct a complaint to the Sheriff's Department more generally. Plaintiffs' desire to relitigate this is not a basis for granting their motion. *R.F.M.A.S., Inc.*, 640 F. Supp. 2d at 512. Furthermore, Plaintiffs argue that this a relevant civilian analogue at a highly generalized level. Of course, a civilian may always lodge a complaint about something a public employee has done or said with *some* public agency. But accepting Plaintiffs' generalized theory would render this already non-dispositive inquiry superfluous. That there is some forum somewhere for a citizen to lodge some complaint, does not, for good reason, automatically transform an employee's unprotected speech into a civilian's protected speech. Therefore, the court rejects this argument as well.

### III. Motions for Sanctions and Attorneys' Fees

In their response briefing, the defendants, except for Dr. Ortt-Gawrys, requested attorneys' fees on the basis that Plaintiffs' present motion is frivolous. (Doc. 43 at 18–19.) In

16

their reply, Plaintiffs interpret this as a request for sanctions and then assert that such a request is itself frivolous, meriting sanctions in return. (Doc. 46 at 13–14.) The court denies both the requested attorneys' fees and the requested sanctions. Both parties must bear their own costs.

### Conclusion

For the foregoing reasons, Plaintiffs' Motion to Alter, Amend, Reconsider, or Vacate Judgment (Doc. 39) is DENIED.

Dated this 12th day of July, 2023.

Geoffrey W. Crawford, Judge
United States District Court